[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10461

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 15, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-20758-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROY M. BELFAST, JR.,
a.k.a. Chuckie Taylor,
a.k.a. Charles McArthur Emmanuel,
a.k.a. Charles Taylor, Jr.
a.k.a. Charles Taylor, II,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 15, 2010)

Before BIRCH, MARCUS and BALDOCK,* Circuit Judges.

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

MARCUS, Circuit Judge:

Roy M. Belfast, Jr., a/k/a Charles McArthur Emmanuel, a/k/a Charles Taylor, Jr., a/k/a Chuckie Taylor, II ("Emmanuel"), appeals his convictions and 97-year sentence for committing numerous acts of torture and other atrocities in Liberia between 1999 and 2003, during the presidency of his father, Charles Taylor. Emmanuel, who is the first individual to be prosecuted under the Torture Act, 18 U.S.C. § 2340-2340A ("the Torture Act"), seeks reversal of his convictions on the ground that the Torture Act is unconstitutional. Primarily, Emmanuel contends that congressional authority to pass the Torture Act derives solely from the United States's obligations as a signatory to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 (the "CAT"); he says the Torture Act impermissibly exceeds the bounds of that authority, both in its definition of torture and its proscription against conspiracies to commit torture. Emmanuel also challenges his convictions under 18 U.S.C. § 924(c), which criminalizes the use or possession of a firearm in connection with a crime of violence. He says, among other things, that this provision cannot apply extraterritorially to his actions in Liberia. Finally, he claims that an accumulation of procedural errors made his trial fundamentally unfair, and that the district court erred in sentencing him.

2

After thorough review, we conclude that all of Emmanuel's convictions are constitutional. The United States validly adopted the CAT pursuant to the President's Article II treaty-making authority, and it was well within Congress's power under the Necessary and Proper Clause to criminalize both torture, as defined by the Torture Act, and conspiracy to commit torture. Furthermore, we hold that both the Torture Act and the firearm statute apply to extraterritorial conduct, and that their application in this case was proper. Finally, we conclude that Emmanuel's trial and the resulting convictions were not rendered fundamentally unfair by any evidentiary or other procedural errors, and that his sentence is without error. Accordingly, we affirm Emmanuel's convictions and sentence in all respects.

## I.

The facts of this case are riddled with extraordinary cruelty and evil. The defendant, Charles McArthur Emmanuel, was born in Massachusetts in 1977, the son of Bernice Yolanda Emmanuel and Charles Taylor. Taylor returned to his native Liberia sometime thereafter. Emmanuel's mother married Roy Belfast in 1983. Apparently out of fear that Taylor would try to take her son, Bernice Emmanuel moved with him and Belfast to Orlando, FL. There, the couple also changed Emmanuel's name to Roy Belfast, Jr.

3

In 1992, Emmanuel visited Liberia, where a bloody civil war had been raging for three years. At the time of Emmanuel's visit, his father, Taylor, led the National Patriotic Front of Liberia ("NPFL"), an armed insurgent group. The NPFL was one faction in the struggle for national power following the assassination of Liberian President Samuel Doe in 1990. After some months, Emmanuel returned to the United States. Two years later, however, Emmanuel again visited Liberia; this time, he did not return. In 1997, Taylor was elected to the presidency. President Taylor soon charged the twenty-year-old Emmanuel with overseeing the state's creation of an Anti-Terrorism Unit ("ATU") -- also known in Liberia as the "Demon Forces" -- which was responsible for protecting Taylor and his family.

Under Emmanuel's direction, the ATU began recruiting men to fill its ranks, and installed them at a former training camp known as Gbatala Base. The base was situated in a swampy area. As described by one recruit, Wesley Sieh, Emmanuel directed the ATU soldiers to dig around twenty grave-size prison pits, which were eventually covered with metal bars or barbed wire. A periodically overflowing river in the vicinity caused some of the pits to fill with water, which then stagnated. Aside from the prison pits, the base included a shooting range, a building containing a holding cell for disobedient ATU soldiers, and an

4

"educational" training facility known as the College of Knowledge. The base was under the command of David Compari; he took orders from Emmanuel, who appeared several times a week wearing the ATU's green tiger-striped uniform and red emblem bearing a cobra and scorpion.

The ATU was Emmanuel's self-described "pet project." At Gbatala and elsewhere, ATU affiliates referred to Emmanuel as "Chief," and his license plate read "Demon." Between 1999 and 2002, the defendant wielded his power in a terrifying and violent manner, torturing numerous individuals in his custody who were never charged with any crime or given any legal process. The following is an account of those acts, as described at length and in disturbing detail at Emmanuel's trial by his victims and others.

A.    1999 Torture of Sierra Leonean Refugees (Counts Three and Four)

In the late 1990s, Sierra Leoneans fled civil war in their country and crossed into Liberia, where they registered with the United Nations as refugees. Among them were Sulaiman Jusu and Momoh Turay, who had resettled in the northern Liberian town of Voinjama in 1998. On April 21, 1999, armed forces attacked Voinjama. Along with other refugees, Turay and Jusu fled towards Monrovia, Liberia, aboard trucks operated by the World Food Program. Yet, as is recounted in their extensive trial testimony, Turay and Jusu never reached Monrovia.

5

Their difficulties began when the refugee trucks were stopped at the St. Paul River Bridge Checkpoint, only about 150 kilometers by road to the southeast of Voinjama, and in the northern vicinity of the town of Gbarnga. ATU soldiers ordered the Sierra Leonean refugee passengers off the trucks and segregated them by gender. Turay and Jusu were in a group that also included Albert Williams, Foday Conteh, and Abdul Cole. ATU soldiers stripped Turay to his underwear, and then searched and interrogated all of the men. Meanwhile, the refugee truck on which Turay, Jusu, and the others had been traveling left the checkpoint without them.

Soon thereafter, the defendant Emmanuel arrived at the checkpoint, shouting and holding a pistol. He confronted the refugees and asked them if they were the rebels who had attacked Voinjama. When none of the detained refugees answered, Emmanuel killed three of them, including Williams, in front of the others; Emmanuel made the three men kneel before him and then shot each of them in the head while telling the other male refugees that they would be next. On Emmanuel's orders, soldiers dragged the bodies away; Jusu and Turay later saw two of the victims' severed heads displayed atop posts at the checkpoint.

The refugees, including Jusu, Turay, Conteh, and Cole, were then placed in a small cell at the checkpoint. When they were taken out, ATU soldiers beat them

6

with their guns, bound them "tabie style" -- their elbows tied so tightly behind their backs as to be touching -- and blindfolded them.  The refugees were then transferred by van to the Gbarnga Police Station while still bound and only in their underwear.  The ATU soldiers continued to beat them during the journey, and Turay was beaten so badly that he defecated on himself.  Within two days, Jusu, Turay, Conteh, and Cole were taken to Gbatala Base, about thirty-five kilometers to the southwest of Gbarnga.

At Gbatala, Emmanuel ordered ATU soldiers to put the four men into the prison pits.  The pits were approximately two-and-a-half feet deep, covered with metal bars and barbed wire, lined with cement, and partially filled with water. Jusu's pit contained a rotting corpse and chin-high water; Turay's pit was filled with water and bones and was so small that it forced him to squat while his hands were tied to the bars covering the hole.  ATU soldiers standing guard continually abused the prisoners, stabbing Jusu and Turay with guns, forcing Jusu to eat burning hot cassava stems that had been roasting in a fire, stepping on Turay's hands, which were tied above his head, and dripping molten plastic onto Turay's naked body.  Turay testified that Emmanuel told the commander of Gbatala Base to "take care of" the prisoners if they did not tell the truth about their involvement with the Kamajors, a militia working in Sierra Leone to fight Taylor's regime.

On their second night in the Gbatala prison pits, Jusu and Cole escaped but were recaptured. ATU soldiers brought them back to the base after beating them with their guns. Emmanuel burned Turay with a cigarette, beat Jusu and Cole, and ultimately ordered that all the prisoners be taken from the pits. Once assembled, Emmanuel told the prisoners that no one escapes from Gbatala, and ordered his soldiers to kill Cole. When an ATU soldier reached for his gun, Emmanuel stopped him, and ordered that Cole be decapitated instead; with a bucket in place to collect the blood, the soldier then slowly sawed Cole's head off with a three-foot knife while Cole cried, screamed, and begged for his life. Emmanuel ordered that the prisoners be taken back to the pits, admonishing them that if anyone else attempted to escape, Cole's punishment would be theirs as well.

After still more beatings, Jusu and Turay were placed in a pit and tied together, by one hand each, to the pit cover. Guards beat them the next day and melted plastic onto their bodies. That night, Jusu and Turay escaped again after being told by another prisoner, whose toes had been cut off, that the ATU planned to kill all of the Sierra Leoneans. But Jusu and Turay were recaptured, and for their attempted escape, they were severely beaten and abused. ATU soldiers burned both men with dripping candles, and the defendant Emmanuel dripped molten plastic all over Jusu's body, including onto genitals. Emmanuel also

8

stabbed both mens' legs -- and Turay's head -- with a bayonet.  The abuse

escalated still further when President Taylor sent a message that he wanted to see

the prisoners who had escaped.

At Taylor's request, Jusu and Turay, along with Conteh, were "tabie" bound

and driven to the president's private compound in Monrovia, known as

Whiteflower.  Once there, Emmanuel and Gbatala Base commander Compari

brought the three prisoners to Taylor and his defense minister, Daniel Chea.

Taylor asked the prisoners if they were the rebels who had attacked Voinjama,

warning them that if they did not talk, their heads would be cut off and buried in

the sand.  Chea observed that the men should have been killed at Gbatala Base, but

suggested that they could at least be forced to provide information.  He proposed

that they be interrogated at Barclay Training Center ("Barclay"), a facility in

Monrovia used by Liberia's national army.

The defendant Emmanuel and the ATU soldiers then brought Jusu, Turay,

and Conteh to Barclay, where they were imprisoned.  They could barely walk or

even move their hands because their faces and bodies were so severely swollen

from the repeated violence they had endured.  The stench from their untreated

wounds was so strong that the other prisoners in their cell demanded that the

guards remove them.   In these conditions, Jusu, Turay, and Conteh were held

9

against their will, without ever being charged with any crime, or allowed to see a lawyer, from late April 1999 until May 20, 1999. The three men were released only when the United Nations High Commissioner intervened.

Upon their release, Jusu, Turay, and Conteh received medical treatment both at a Monrovia clinic and at a United Nations refugee camp. They were resettled with their families in March 2000 in Sweden.

## B. 1999 Torture of Rufus Kpadeh (Count Five)

The Liberian town of Voinjama was again attacked in August 1999, and, again, residents, including farmer and furniture-maker Rufus Kpadeh, fled the city. At trial, Kpadeh testified in detail about his flight from Voinjama and, ultimately, his terrifying ordeal at the hands of Emmanuel and the ATU.

From Voinjama, Kpadeh fled with his family, first on foot and then on a truck operated by a non-governmental organization. Armed ATU soldiers stopped the truck at the St. Paul River Bridge Checkpoint and ordered the male passengers to step down. ATU soldiers detained Kpadeh after they searched his bag and found an identification card from the Unity Party, a non-violent political party opposing the Taylor regime. Emmanuel, who was dressed in an ATU uniform and had a pistol at his side, interrogated Kpadeh, asking him if he was a rebel. Kpadeh said he was not. Emmanuel then asked Kpadeh if he would fight for him. Kpadeh

said he would not because he did not believe in war. On Emmanuel's orders, ATU soldiers stripped Kpadeh naked, tied his legs, bound his arms tabie-style, blindfolded him, and took him by truck to Gbatala Base.

Once at Gbatala Base, Emmanuel ordered that Kpadeh be placed in something known as the "Vietnam Prison," and ordered Compari, the base commander, to torture Kpadeh until he told the truth. Before putting Kpadeh in the prison, Compari plunged him, still bound, into a creek four times, holding his head underwater. At Emmanuel's express instruction, Compari then cut the underside of Kpadeh's genitals with a knife. At the "Vietnam Prison," Kpadeh was put in a five-foot-deep pit covered with metal bars and containing chest-high water in which, still naked, he was forced to squat. Kpadeh shared his pit with other prisoners, all of whom were forced to urinate in the stagnant water. By the time Kpadeh's elbows were untied, his arms and hands were numb. Kpadeh never received medical attention for the wounds on his genitals, which continued to bleed for two weeks.

Kpadeh was kept naked in the pits at Gbatala Base and was repeatedly abused for approximately two months. He was removed from the pits only to be tortured or to defecate. The abuse was worse on the days Emmanuel visited the base. Once, Emmanuel ordered Kpadeh to "run the rim" for 45 minutes, meaning

that Kpadeh was forced to run in a large circle with a heavy, six-foot log on one shoulder, while ATU soldiers would strike the log with a metal rod, causing extreme pain to shoot through Kpadeh's body. On another occasion, Emmanuel ordered Kpadeh, along with other Gbatala Base prisoners, to play soccer with a large stone and no shoes, causing their feet to bleed and bruise. Emmanuel watched and laughed. On still another occasion, Emmanuel forced Kpadeh to sodomize another prisoner and also to be sodomized, again while Emmanuel watched and laughed. ATU soldiers would also beat Kpadeh, burn him with melted plastic, jab him with the iron used to clean the barrel of a gun, and shovel stinging ants onto his body. He and the other prisoners were forced to eat cigarette butts and drink their own urine.

During his nearly two months of captivity, Kpadeh, like Turay, Jusu, and Conteh, was never charged with a crime, brought before a judge, or allowed any legal representation. In October 1999, Kpadeh was released from Gbatala Base; his release coincided with media reports about Gbatala Base and pressure from human rights groups. Just prior to his release, the ATU gave him soap to bathe, had his hair cut, and provided him with clothing, all while instructing him not to tell the human rights organizations about Gbatala Base. He received medical treatment at a Monrovia hospital for three months. Kpadeh currently resides in

Liberia and lives with residual scars, pain, and limited functioning of one hand as a result of his time at Gbatala Base.

### C. 2002 Torture of Varmyan Dulleh (Count Six)

The jury also heard extensively from torture victim Varmyan Dulleh. Dulleh was a student at the University of Monrovia and had joined the Student Unification Party, an organization advocating social justice and peace. He was also a member of the Mandingo ethnic group, which was known to have opposed President Taylor during the civil war. In addition, Dulleh's uncle was the former leader of a group that had sought to overthrow the prior Liberian president, and who had run against Taylor in a subsequent election.

On July 24, 2002, armed gunmen, including ATU soldiers, arrested Dulleh at his home on the charge that he sought to overthrow President Taylor. After Dulleh was interrogated, the Liberian Police Director took him to Whiteflower. At Whiteflower, Dulleh denied any involvement in attempting to overthrow Taylor's government. President Taylor ordered that Dulleh be placed in the custody of General Benjamin Yeaten, the head of Liberia's Special Security Service. Yeaten was instructed to beat Dulleh until he told the truth. When Dulleh again denied knowing anything, Yeaten took him to his garage, ordered soldiers to put a dirty rag in his mouth, and burned him with a heated clothes iron on his arm, back,

13

stomach, and foot.

The defendant Emmanuel arrived while the abuse was in progress, and watched as Dulleh was branded.  After Dulleh again denied any involvement in rebel activities, Yeaten poured scalding water onto his head and back, and into his hands.  Emmanuel pointed a gun at Dulleh's head and told him not to drop any of the scalding water in his hands.  Emmanuel also shocked Dulleh's neck, back, and genitals with a cattle prod.  Both Emmanuel and Yeaten then threatened to kill Dulleh, and soldiers poured salt into his wounds.

After this savage beating, Dulleh was confined for almost a year, mostly in filthy conditions.  At first, he was imprisoned with other individuals in a shallow cement hole beneath a disused truck scale at Klay Junction.  The steel grate on the underside of the scale shut out the light, and the hole, which was at most three feet deep, was partially flooded with filthy water, contained animals such as toads and snakes, and emitted a vile stench.  While imprisoned at Klay Junction, Dulleh told the other prisoners that he had been tortured and beaten by Emmanuel; they observed the burns and fresh wounds on his body.  About two weeks later, Dulleh was removed from the hole at Klay Junction and flown by helicopter to an undisclosed location, where he was confined for a month in an abandoned outhouse.  Finally, he was held at the National Bureau of Investigation in

14

Monrovia for ten months.

Dulleh was released on July 11, 2003, in response to international pressure from the United States ambassador, the Catholic Church, and human rights groups. Despite the fact that Liberian courts were open and operating, Dulleh was never charged with any crime, brought before a court, or allowed to see an attorney. He fled Liberia within a week of his release, and was granted asylum in the United States in 2005.

D.    2002 Torture of Mulbah Kamara (Count Seven)

Mulbah Kamara, a Liberian of Mandingo ethnicity and another one of Emmanuel's victims, also testified at trial. Kamara ran several Monrovia businesses, including a computer school, an Internet café, and a communications center. In September 2002, his home and one of his businesses were ransacked and burglarized. He reported the incidents to the police. As he was leaving the police station, however, he was arrested, stripped to his underwear, and thrown into a truck.

Armed men drove Kamara to a beach, where he saw people lying on the ground, some of them dead. He was then brought to Whiteflower, where President Taylor repeatedly asked him if he knew why he was there. Kamara answered that he did not. Taylor then ordered General Yeaten to take Kamara away, and armed

men drove him to Yeaten's house. Once there, Kamara was stripped naked and made to lie face down in the garage, where he was guarded by a group of ten- to twelve-year-old boys armed with automatic weapons. On the general's orders, the boys put a hot, bright spotlight close to Kamara's face and told him not to close or move his eyes; Kamara was forced to stay in that position for hours and was beaten if he blinked. The light, which caused Kamara great pain, was shone continually in his face over a three-day confinement at the general's home.

Later, Yeaten again asked Kamara why he was there; when Kamara again responded that he did not know, Yeaten ordered him to bend over, inserted an electrical prod into his anus, and shocked him. The electrical shock traveled all over Kamara's body, including, by his account, through his brain, and made him feel like he was going to die. Yeaten also shocked Kamara's penis with the electrical prod, and then kicked and beat him with the butt of a gun. Later, after declaring which parts of Kamara's body they were going to eat, the child soldiers further beat Kamara, who by that time was incapable of the slightest resistance as a result of the unremitting abuse.

The next day, the defendant Emmanuel arrived at Yeaten's home with bodyguards and armed, uniformed men. Emmanuel asked Kamara if he was ready to talk; Kamara replied that he did not know what to say. Emmanuel then told his

16

entourage to "take care of" Kamara. The soldiers kicked him to the ground and beat his stomach and groin while Emmanuel watched and laughed. After Emmanuel left, Yeaten used a hot clothes iron to scorch Kamara's stomach, knee, and genitals, burning his skin off.

After his three-day confinement at Yeaten's house, Kamara was taken to Klay Junction, where he was kept for thirteen days in an underground hole filled with dirty water. After being transferred to another location in Liberia, Kamara was imprisoned at the National Bureau of Investigation. There, he saw Dulleh, whom he recognized from his past employment working with European Union imports at the Port of Monrovia.

Kamara was released from prison in late December 2002, but was ordered to report to President Taylor's executive mansion every day. He was never charged with a crime or brought before a court. His former superior, a European Union official, helped Kamara and his family flee Liberia. In February 2003, Kamara was admitted to the United States, where he still lives and suffers from lingering medical issues, including vision problems and disfigured genitals.

E.    Emmanuel's Conduct After the Fall of the Taylor Regime

In 2003, Liberia's civil war ended. President Taylor resigned, left the country, and was ultimately extradited to the Hague, where he is currently on trial

17

for crimes against humanity in the Special Court for Sierra Leone. Emmanuel left Liberia in July 2003. Between 2004 and 2005, he called the United States Defense Attaché in Liberia from Trinidad several times, seeking information about the United Nations travel ban on certain persons, inquiring about joining the United States Marines, and claiming that he was an American who could go home whenever he wanted.

On March 30, 2006, when Emmanuel arrived at Miami International Airport on a flight from Trinidad, officials executed a warrant for his arrest for attempting to enter the United States using a false passport. Emmanuel's luggage contained a book on guerilla tactics and a notebook with rap lyrics, some making reference to the ATU. During his arrest, Emmanuel knowingly waived his rights and made the following statements: first, that his father was Charles Taylor, even though he had listed "Daniel Smith" as his father on a recent U.S. passport application; second, that the ATU was his "pet project" prior to 2000 and that he was considered its commander; and third, that he was present when a "press guy" was arrested by "the general" -- Yeaten -- and was beaten and burned with an iron.

In November 2007, a grand jury sitting in the United States District Court for the Southern District of Florida returned an eight-count superseding indictment against Emmanuel. Count One charged him with a conspiracy to commit torture in

18

Liberia against seven unnamed victims -- with death resulting to at least one victim -- by seizing, imprisoning, interrogating, and mistreating them, and by committing various acts with the specific intent to inflict severe physical pain and suffering, all in violation of 18 U.S.C. § 2340A(c). Count Two charged Emmanuel with a conspiracy to use and carry a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(o). Counts Three through Seven charged him with committing substantive crimes of torture against five named victims, in violation of 18 U.S.C. § 2340A(a). Count Eight charged Emmanuel with using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).

Emmanuel moved to dismiss the indictment, claiming, among other things, that the Torture Act is unconstitutional. The district court denied that motion, concluding that the Torture Act was a proper exercise of Congress's power "under the Necessary and Proper Clause of Article I, as an adjunct to the Executive's authority under Article II to enter into treaties." Order denying motion to dismiss indictment, at 10, United States v. Emmanuel, No. 06-20758 (S.D. Fla. July 5, 2007). The district court specifically rejected Emmanuel's argument that the Torture Act was unconstitutional because its language did not precisely mirror the definition of torture contained in the CAT; the court explained that Congress

19

needed "flexibility" in performing its "delegated responsibilities," and concluded that the Torture Act "plainly bears a rational relationship" to the CAT. Id. at 15. The district court also determined that Congress had the power to apply the Torture Act extraterritorially, and had clearly expressed its intent to do so. Id. at 19-20. Finally, the district court concluded that 18 U.S.C. § 924(c) also applied to Emmanuel's extraterritorial conduct because Emmanuel had committed a crime of violence that could be prosecuted in the United States, which is all the statute, on its face, requires. Id. at 20-22.

After a one-month trial, the jury convicted Emmanuel on all seven counts of the superseding indictment. A presentence investigation report ("PSI") was then prepared for Emmanuel under the 2002 Sentencing Guidelines manual. First, because Emmanuel had witnessed various acts of torture, had ordered others to commit torture, and had engaged in torturous acts that were part of a campaign to quell opposition to his father's presidency, he was assessed a four-level aggravating role adjustment for being a leader pursuant to U.S.S.G. § 3B1.1(a). Second, because Emmanuel was convicted of more than one offense, the PSI applied the multiple count aggregation rules contained in U.S.S.G. § 3D1.2. The PSI established an offense group for each of the ten victims relating to the conspiracy-to-commit-torture count (Count One), and, where applicable, grouped

20

the substantive counts (Counts Three through Seven) with Count One under

U.S.S.G. §§ 1B1.2(d) and 3D1.2(b). Specifically, the PSI identified seven victims

that Emmanuel tortured (Jusu, Turay, Conteh, Cole, Kpadeh, Dulleh, and Kamara)

and three victims that he shot and killed (Williams and two unnamed individuals at

the St. Paul River Bridge Checkpoint). Pursuant to U.S.S.G. § 3D1.2(c), the PSI

treated the conspiracy conviction under the firearm statute (Count Two) as a

specific offense characteristic, or adjustment, for the individual groups to which it

pertained. Count Eight, the substantive offense of using and carrying a firearm

during a crime of violence, in violation of 18 U.S.C. § 924(c), was not included in

the grouping because it carries a mandatory consecutive sentence.

The Sentencing Guidelines provide that multiple substantive guidelines may

apply to convictions under the Torture Act. U.S.S.G. app. A. The PSI applied

U.S.S.G. § 2A4.1, the provision relating to kidnapping, abduction, and other

unlawful restraints, to the ten offense groups, yielding a base offense level of 24.

Moreover, because Emmanuel killed three victims under circumstances

constituting murder, the district court applied to those three offense groups §

2A4.1(c)(1)'s cross-reference to § 2A1.1, the guideline applicable to murder. This

calculation yielded a base offense level of 43, which was then subjected to a four-

level aggravating role increase under § 3B1.1(a) and a multi-count adjustment

21

under § 3D1.4. Emmanuel's final combined, adjusted offense level was 51.

Emmanuel objected to the PSI. In particular, he argued that the application of the § 2A4.1 kidnapping guideline and the § 2A1.1 murder cross-reference was unconstitutional and improper, because he had not been charged with or convicted of either kidnapping or murder, and because none of the murders resulted from the alleged torture. Emmanuel also argued that the district court could not constitutionally sentence him for anything other than torture, because the CAT did not specifically prohibit murder or kidnapping. Emmanuel suggested, instead, that the aggravated assault guideline, § 2A2.2, better represented his convicted conduct. Emmanuel also objected to the PSI's use of ten offense groups, arguing that Williams, Cole, and the two unnamed individuals did not merit their own offense groups because there was insufficient evidence at trial that Emmanuel had killed them.

The district court concluded that the kidnapping guideline, U.S.S.G. § 2A4.1, was the most appropriate of the potentially applicable guidelines, because the offenses against all of the victims contained one or more elements of unlawful restraint, abduction, or kidnapping. The district court observed that, whether or not the victims' initial detention was lawful, their continued detention plainly was not. Next, in addressing Emmanuel's objection to the application of § 2A4.1's cross-

22

reference to § 2A1.1, the district court determined that this cross-reference did not require that the victim's death have resulted from any torture. It found that the § 2A4.1 cross-reference applied because the evidence showed that more than one victim was killed in circumstances that constituted murder. Consequently, the district court found that the base offense level was 43, and that a four-level aggravating role enhancement applied pursuant to U.S.S.G. § 3B1.1(a). Inasmuch as an offense level of 43 is the highest level contained in the sentencing guidelines, and corresponds to life imprisonment, the district court ultimately set Emmanuel's offense level at 43.

After hearing from the parties regarding the 18 U.S.C. § 3553(a) factors, the court imposed a total sentence of 1,164 months, or 97 years, of imprisonment. The total term consisted of 240 months each for Counts One and Two, 120 months each for Counts Three through Seven, and 84 months for Count Eight, all running consecutively.

The district court entered judgment on January 1, 2009, and Emmanuel timely appealed.

## II.

Congress passed the Torture Act to implement the United States's obligations under the Convention Against Torture, which itself was the product of

a long-evolving international consensus against torture committed by official actors. The CAT was adopted by the United Nations General Assembly on December 10, 1984. The preamble to the CAT recognizes the obligation of nations, under the U.N. Charter, to "promote universal respect for, and observance of, human rights and fundamental freedoms." See CAT, pmbl. The preamble thus announced the treaty's broad purpose of "mak[ing] more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Id.

President Reagan signed the Convention Against Torture on April 18, 1988, and approximately one month later, the CAT was transmitted to the Senate for its advice and consent, along with seventeen reservations, understandings, and declarations. See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 7 (1990). In January 1990, President George H.W. Bush submitted a revised list of such conditions. See id. at 7-11. Of particular relevance here, the United States expressed its understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." See id. at 9, 36. The Senate adopted a resolution of advice and consent to ratification of the CAT on October 27, 1990, subject to several conditions, including the one just

24

mentioned. President Clinton deposited the instrument of ratification, which included the Senate reservations, understandings, and declarations, with the United Nations on October 21, 1994. The CAT became the law of the land on November 20, 1994, thirty days after it was deposited for ratification with the United Nations. At present, 146 nations are signatories to the CAT.

The CAT defines "torture" this way:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT, art. 1(1). The CAT excludes from its purview "pain or suffering arising only from, inherent in or incident to lawful sanctions." Id.

Article 2(1) of the CAT requires each signatory nation to "take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction." Specifically, each signatory is obliged to "ensure that all acts of torture are offences under its criminal law," and must also criminalize "any attempt to commit torture and . . . an act by any person which constitutes complicity or participation in torture." CAT, art. 4(1). Article 5(1)-(2)

25

requires each signatory nation to "take such measures as may be necessary to establish its jurisdiction over the offences [described] . . . [w]hen the alleged offender is a national of that State" and "where the alleged offender is present in any territory under its jurisdiction and it does not extradite him."

Because the resolution of advice and consent from the Senate specified that the CAT was not self-executing,[1] Congress passed the Torture Act, 18 U.S.C. §§ 2340-2340A, on April 30, 1994, pursuant to Articles 4 and 5 of the CAT.[2]

The Torture Act provides that "[w]hoever outside the United States commits

---

[1] Certain treaties are not "self-executing," meaning that they cannot create judicially enforceable rights until Congress passes implementing legislation. See Auguste v. Ridge, 395 F.3d 123, 132 n.7 (3d Cir. 2005). We have previously recognized that the CAT is not self-executing. Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1240 n.1 (11th Cir. 2004).

[2] Congress also enacted other statutes in response to the CAT. The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G., Tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231) (the "FARRA"), for example, was enacted in 1998 and makes it the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of an individual to a country where he is in danger of being subjected to torture. FARRA adopted the CAT's definition of torture. See 8 C.F.R. § 208.18(a). The Torture Victim Protection Act of 1991 (the "TVPA"), 28 U.S.C. § 1350 note, provides a civil tort remedy for victims of torture and defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. 102-256 § 3(b)(1).

or attempts to commit torture shall be fined . . . or imprisoned not more than 20 years, or both, and if death results . . . shall be punished by death or imprisoned for any term of years or for life."  18 U.S.C. § 2340A(a).  The federal courts have jurisdiction if "the alleged offender is a national of the United States[,] or [if] the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender."  Id. § 2340A(b).  A person who conspires to commit an offense under the Torture Act is subject to the same penalties prescribed for the offense itself.  Id. § 2340A(c).

The Torture Act defines torture as

> an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control.

Id. § 2340(1).  "Severe mental pain or suffering," in turn, is defined as

> the prolonged mental harm caused by or resulting from --
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality . . . .

27

Id. § 2340(2).

## III.

Emmanuel claims that the Torture Act exceeds Congress's powers under the Constitution in several respects. We review such constitutional challenges to legislation de novo. United States v. Ferreira, 275 F.3d 1020, 1024 (11th Cir. 2001).

## A.

The heart of Emmanuel's argument is that the Torture Act is invalid because its definition of torture sweeps more broadly than that provided by the CAT.[3] According to Emmanuel, there are three crucial differences between the definition of torture in the CAT and the Torture Act: first, the CAT requires that "torture" be committed for some proscribed purpose -- specifically, "for such purposes as" obtaining information, punishing, intimidating, or coercing a person, or for "any reason based on discrimination of any kind," CAT, art. 1(1) -- whereas the Torture Act does not require the government to prove the defendant's motive; second, the CAT requires that the torturer's actions actually result in "severe pain and suffering," whereas the Torture Act requires only an act committed with the

---

[3] Emmanuel does not dispute that the United States validly adopted the CAT pursuant to the President's Article II power to enter into treaties with the advice and consent of the Senate, see U.S. Const. art. 2, § 2, cl. 2.

"specific[] inten[tion] to inflict severe physical or mental pain or suffering"; and third, the CAT limits the scope of "torture" to conduct committed by "a public official or other person acting in an official capacity," whereas the Torture Act requires that the torturous conduct be "committed by a person acting under the color of law." Because Emmanuel challenges the statute on its face, the hurdle he must clear is an exceedingly high one. See United States v. Salerno, 481 U.S. 739, 745 (1987).[4]

Article II gives the President the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. In determining whether Congress has the authority to enact legislation implementing such a treaty, we look to the Necessary and Proper Clause. Ferreira, 275 F.3d at 1027. That clause confers on Congress the "Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18. Collectively, these clauses empower Congress to enact any law that is

---

[4] Although Emmanuel says once in his brief that he challenges the statute "as applied," he provides no substantive argument on this point, and there is no indication that the statute's alleged deviations from the CAT apply to him. The torture he is alleged to have committed was undertaken for a particular purpose (to intimidate any possible dissenters to his father's regime and extract information from them), caused severe physical and mental pain and suffering, and was perpetrated while he was acting in an official capacity.

necessary and proper to effectuate a treaty made pursuant to Article II.

In recognition of the expansive language of the Necessary and Proper Clause, the Supreme Court has made clear that the clause "grants Congress broad authority to enact federal legislation." United States v. Comstock, -- U.S. --, 130 S. Ct. 1949, 1956 (2010) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413-14 (1819)); see also Katzenbach v. Morgan, 384 U.S. 641, 650 (1966). Thus, the Court has explained, "the word 'necessary' does not mean 'absolutely necessary.'" Comstock, 130 S. Ct. at 1956. Rather, "the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" Id. (citation omitted). As Chief Justice Marshall wrote in McCulloch v. Maryland, "[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 17 U.S. (4 Wheat) at 421.

Thus, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the

implementation of a constitutionally enumerated power." Comstock, 130 S. Ct. at 1956 (emphasis added); see also Gonzales v. Raich, 545 U.S. 1, 22 (2005) (upholding statute enacted pursuant to Commerce Clause because "Congress had a rational basis" for concluding that statute implemented congressional power under the Commerce Clause); Sabri v. United States, 541 U.S. 600, 605 (2004) (noting that review under the Necessary and Proper Clause is for "means-ends rationality"). In United States v. Lue, for example, the Second Circuit applied this rational relationship test in upholding the constitutionality of the Hostage Taking Act, which was enacted to implement the Hostage Taking Convention. 134 F.3d 79 (2d Cir. 1998). The court observed that

> the "plainly adapted" standard [from McCulloch] requires that the effectuating legislation bear a rational relationship to a permissible constitutional end. Were this not the case, any congressional enactment not passed pursuant to an expressly enumerated power would be subject to challenge on some more rigorous means-end analysis. Such thoroughgoing judicial involvement in the day-to-day enactments of Congress would undercut the foundation on which M'Culloch rests: the need to preserve a realm of flexibility in which Congress can carry out its delegated responsibilities.

Id. at 84 (emphasis added). We, too, have recognized that the rational relationship test is an appropriate way to determine whether a federal enactment is authorized by the Necessary and Proper Clause in connection with an enumerated power. Ferreira, 275 F.3d at 1027-28 (adopting the reasoning and holding of Lue in a

31

similar constitutional challenge to the Hostage Taking Act).

Congressional power to pass those laws that are necessary and proper to effectuate the enumerated powers of the Constitution is nowhere broader and more important than in the realm of foreign relations. Correspondingly, the judiciary's role in reviewing the acts of Congress in this area must be appropriately circumscribed. As the D.C. Circuit has explained,

> a determination by the political branches concerning the obligations of the United States is also a determination about the conduct of American foreign policy. Defining and enforcing the United States' obligations under international law require the making of extremely sensitive policy decisions, decisions which will inevitably color our relationships with other nations. Such decisions are "delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ."

Finzer v. Barry, 798 F.2d 1450, 1458-59 (D.C. Cir. 1986) (quoting Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948)), aff'd in part and rev'd in part sub nom. Boos v. Barry, 485 U.S. 312 (1988). Indeed, there is a particularly strong case for deference to the political branches,

> over and above the traditional and general requirement of restraint in the area of foreign relations, [when a court is] asked to review a statute which both Congress and . . . [a] President[] have declared to be necessary to fulfill our obligations under both customary international law and a treaty which we have signed.

32

Id. at 1459.

It follows generally that "[i]f [a] treaty is valid there can be no dispute about the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to execute the powers of the Government." Missouri v. Holland, 252 U.S. 416, 432 (1920); see also Lue, 134 F.3d at 84 ("If the Hostage Taking Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause."). Thus, while our task in interpreting a treaty is ordinarily to give it a "meaning consistent with the shared expectations of the contracting parties," Air France v. Saks, 470 U.S. 392, 399 (1985), our role is narrowed considerably "where the President and the Senate [have] express[ed] a shared consensus on the meaning of [the] treaty as part of the ratification process," Auguste v. Ridge, 395 F.3d 123, 143 (3d Cir. 2005). In such a case, that "shared consensus . . . is to govern in the domestic context." Id.

Notably, the existence of slight variances between a treaty and its congressional implementing legislation do not make the enactment unconstitutional; identicality is not required. Rather, as the Second Circuit held in Lue, and as we echoed in Ferreira, legislation implementing a treaty bears a "rational relationship" to that treaty where the legislation "tracks the language of

33

the [treaty] in all <u>material</u> respects." <u>Lue</u>, 134 F.3d at 84 (emphasis added); <u>see also</u> <u>Ferreira</u>, 275 F.3d at 1027-28. In <u>Lue</u>, for example, the claim was that the Hostage Taking Act strayed too far from the bounds of the Hostage Taking Convention in defining a "hostage taker." The Hostage Taking Convention defined a hostage taker this way:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a <u>third party</u>, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage[, is a hostage taker].

<u>Lue</u>, 134 F.3d at 82 (emphasis added) (quoting Hostage Taking Convention, art. 1). The Hostage Taking Act defined a hostage taker in a slightly different manner, providing, among other things, an arguably broader definition of "third party":

> [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so[, is a hostage taker].

<u>Id.</u> at 81-82 (quoting 18 U.S.C. § 1203(a)). Yet, these differences in language and scope between the treaty and its implementing legislation did not mean that one lacked a rational relationship to the other. Instead, because the differences in language were not material, the Second Circuit found a rational relationship

34

between the Hostage Taking Convention and the Hostage Taking Act. Id. at 84.

Applying the rational relationship test in this case, we are satisfied that the Torture Act is a valid exercise of congressional power under the Necessary and Proper Clause, because the Torture Act tracks the provisions of the CAT in all material respects. The plain language of the CAT controls the analysis of its scope, Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 194 (1993), and the CAT declares broadly that its provisions are "without prejudice to any international instrument or national legislation which does or may contain provisions of wider application," CAT, art. 1(2). Put simply, the CAT created a floor, not a ceiling, for its signatories in their efforts to combat torture. Moreover, settled rules of treaty interpretation require that we construe the CAT generously:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

Factor v. Laubenheimer, 290 U.S. 276, 293-94 (1933).

Turning, then, to the Torture Act, we examine each of the three variances

35

that Emmanuel identifies between its provisions and those of the CAT.

First, Emmanuel points out that the CAT and the Torture Act differ in that Article 1(1) of the CAT requires that torture be intentionally inflicted on another person

> for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind,

whereas the Torture Act does not require the government to prove the defendant's motive. This difference, however, is simply not material.

The list provided in the CAT, which is prefaced by the phrase "for such purposes as," is not integral to the definition of torture. Rather, as courts have recognized in the context of other federal statutes that adopt the CAT's definition of torture, the CAT independently requires that torture be committed "intentionally," CAT, art. 1(1), and the "for such purposes" language serves only to "reinforce" that requirement -- i.e., "that torture requires acts both intentional and malicious." Price v. Socialist People's Libyan Arab Jamarhiriya, 294 F.3d 82, 93 (D.C. Cir. 2002) (emphasis added) (internal citations omitted) (discussing similar "for such purposes as" language in the Torture Victim Protection Act and Foreign Sovereign Immunities Act). The "for such purposes" language is meant merely "to

36

illustrate the common motivations that cause individuals to engage in torture . . .

[and to] ensure[] that, whatever its specific goal, torture can occur . . . only when

the production of pain is purposive, not merely haphazard." Id.

Furthermore, the congressional definition of torture contained in the Torture

Act fully embodies the considerations that the CAT's "for such purposes" language

is intended to "reinforce." Congress properly understood the thrust of this

language to require intentionality on the part of the torturer:

> The requirement of intent is emphasized in Article 1 by reference to illustrate motives for torture: obtaining information of a confession, intimidations and coercion, or any reason based on discrimination of any kind. The purposes given are not exhaustive, as is indicated by the phrasing "for such purposes as." Rather, they indicate the type of motivation that typically underlies torture, and emphasize the requirement for deliberate intention or malice.

S. Exec. Rep. 101-30, at 14. The Torture Act in no way eliminates or obfuscates

the intent requirement contained in the offense of torture; instead, the Act makes

that requirement even clearer by stating that the proscribed acts must have been

"specifically intended" to result in torture. 18 U.S.C. § 2340(1).

Congress simply did not exceed its power to implement the CAT, pursuant

to the Necessary and Proper Clause, by omitting a provision that merely

"reinforces" the core definition of torture as an intentional and malicious act.

Again, the Necessary and Proper Clause gives Congress "broad power to enact

laws that are 'convenient, or useful' or 'conducive' to the . . . 'beneficial exercise'" of an enumerated power.  Comstock, 130 S. Ct. at 1956 (citation omitted).  The means chosen by Congress to criminalize torture in the Torture Act "are appropriate, [and] are plainly adapted to that end," McCulloch, 17 U.S. (4 Wheat) at 421; they faithfully implement the purpose of the CAT to outlaw, broadly, the cruel, inhuman, and degrading infliction of pain and suffering by official actors.  The means by which Congress implemented the CAT therefore fully "consist with the letter and spirit of the constitution, [and] are constitutional."  Id.

Second, Emmanuel claims that the Torture Act oversteps the bounds of the CAT by criminalizing not only consummated acts of torture, but acts done with no more than the "specific[] intent[ion] to inflict" severe pain or suffering, whether or not such pain or suffering is actually inflicted.  Emmanuel correctly characterizes the proscriptions of the Torture Act, see 18 U.S.C. § 2340(1) ("'[T]orture' means an act . . . specifically intended to inflict severe physical or mental pain or suffering . . . ."), but he fails to persuade us that they are unconstitutional.

The CAT expressly directs state parties to punish unconsummated crimes of torture.  Specifically, it requires that state parties criminalize not only torture, but also attempts to commit torture.  CAT, art. 4(1) ("Each State Party shall ensure that all acts of torture are offences under its criminal law.  The same shall apply to an

38

attempt to commit torture . . . . "). In simple terms, an attempt to commit torture is exactly the same as an act done with the specific intent to commit torture. See United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (explaining that the crime of attempt consists of some overt act, e.g., a substantial step, done with the requisite specific intent). There is accordingly no merit to this second claim concerning the definition of torture.

Third, we reject Emmanuel's claim that the Torture Act is invalid because its official-conduct requirement uses the phrase "under the color of law," rather than the phrase "in an official capacity," as found in the CAT. The Senate Executive Committee charged with evaluating the CAT aptly explained that there is no distinction between the meaning of the phrases "under the color of law" and in "an official capacity":

> The scope of the Convention is limited to torture "inflicted by or at the instigation or with the consent or acquiescence of a public official or other person acting in an official capacity." Thus, the Convention applies only to torture that occurs in the context of governmental authority, excluding torture that occurs as a wholly private act or, in terms more familiar in U.S. law, it applies to torture inflicted "under color of law."

S. Exec. Rep. 101-30, at 14. Similarly, in the context of 42 U.S.C. § 1983, the Supreme Court has explained that "[t]he traditional definition of acting under color of state law requires that the defendant . . . have exercised power 'possessed by

39

virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)); see also Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995) (looking to the § 1983 color-of-law jurisprudence for guidance on whether a defendant engaged in official action under the Alien Tort Statute).  There is no material difference between this notion of official conduct and that imparted by the phrase "in an official capacity."

In sum, we can discern no merit to any of Emmanuel's constitutional challenges to the way in which Congress defined torture in the Torture Act.  If anything, the arguably more expansive definition of torture adopted by the United States is that much more faithful to the CAT's purpose of enhancing global efforts to combat torture.

B.

Emmanuel also claims that the Torture Act is unconstitutional because it applies during armed conflicts, but that claim is easily rejected.  The CAT itself says that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture."  CAT, art. 2(2).  Referring to that provision, the Senate Executive Report explained that

> [t]he use of torture in wartime is already prohibited within the scope of the Geneva Conventions, to which the United States and virtually all other countries are Parties, and which in any event generally reflect customary international law. The exclusion of public emergency as an excuse for torture is necessary if the Convention is to have significant effect, as public emergencies are commonly invoked as a source of extraordinary powers or as a justification for limiting fundamental rights and freedoms.

S. Exec. Rep. 101-30, at 15; see also Nuru v. Gonzales, 404 F.3d 1207, 1222 (9th Cir. 2005) ("Even in war, torture is not authorized."). Accordingly, there is no merit to Emmanuel's contention that the CAT, or legislation authorized by the CAT, cannot apply during armed conflicts.

## C.

Emmanuel also fails to persuade us that he cannot be prosecuted for torture committed before Liberia became a signatory to the Convention Against Torture in 2004. Nothing in the CAT limits its application to torture committed within the territorial borders of its signatories. Indeed, such a limitation would be at odds with the treaty's core purpose of "mak[ing] more effective the struggle against torture . . . throughout the world," CAT, pmbl., inasmuch as any nation that wished to practice torture, even on a huge scale, could avoid all responsibility by not signing the CAT in the first place, or by withdrawing from the CAT before engaging in torture. To avoid precisely those possibilities, the CAT requires each state party to "ensure that all acts of torture are offences under its criminal law."

41

Id. art. 4(1). Congress faithfully implemented the CAT's directive to prosecute torture wherever it may occur, applying the proscriptions of the Torture Act to "[w]hoever outside the United States commits . . . torture." 18 U.S.C. § 2340A(a) (emphasis added).

Emmanuel, for his part, is bound by the Torture Act, a valid congressional enactment. The Supreme Court made clear long ago that an absent United States citizen is nonetheless "personally bound to take notice of the laws [of the United States] that are applicable to him and to obey them." Blackmer v. United States, 284 U.S. 421, 438 (1932). Emmanuel was a United States citizen at all relevant times -- when the Torture Act was passed and when he committed all of the acts for which he was convicted. As such, he is bound by United States law "made applicable to him in a foreign country." Id. at 436. "For disobedience to its laws through conduct abroad, he was subject to punishment in the courts of the United States." Id. Thus, there was nothing improper about application of the Torture Act to Emmanuel's conduct in Liberia before that country signed the CAT.

## D.

Next, Emmanuel argues that his convictions are invalid because the Torture Act allows federal courts to take jurisdiction over an act of torture based solely on the presence of the alleged torturer in the United States, something he claims is not

authorized by the CAT or any other provision of law. Notably, there was no need to invoke this so-called "present-in" jurisdiction in this case because Emmanuel is a United States citizen. See 18 U.S.C. § 2340A(b)(1) (conferring jurisdiction over acts of torture where "the alleged offender is a national of the United States"). Thus, we address Emmanuel's objection to "present-in" jurisdiction only in the context of his facial challenge to the Torture Act.

Article 5(2) of the CAT obligates a signatory nation to assert jurisdiction over an "alleged offender" who is "present in any territory under its jurisdiction" and whom it does not extradite. It is difficult to see what clearer authorization of "present-in" jurisdiction the CAT might have contained. Consistent with the plain language of the CAT, Congress placed the following jurisdictional provision in the Torture Act:

> (b) Jurisdiction -- There is jurisdiction over the activity prohibited in subsection (a) if --
>
> (1) the alleged offender is a national of the United States; or
> (2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender.

18 U.S.C. § 2340A(b). Plainly, even if subsection (b)(2) had provided the exclusive basis for jurisdiction in this case -- and it did not -- that fact would not have rendered Emmanuel's convictions infirm in any way.

E.

43

Emmanuel also challenges his Torture Act convictions on the ground that the Torture Act does not apply to the extraterritorial conduct of a United States citizen. He is, once again, incorrect, because Congress has the power to regulate extraterritorial conduct, and the requisite expression of congressional intent to do so is found in the Torture Act.

It has long been established that Congress has the power to regulate the extraterritorial acts of U.S. citizens. United States v. Plummer, 221 F.3d 1298, 1304 (11th Cir. 2000); see also United States v. Baker, 609 F.2d 134, 136 (5th Cir. 1980)[5] (noting that "[s]ince an early date, it has been recognized that Congress may attach extraterritorial effect to its penal enactments," and that "a nation's 'power to secure itself from injury may certainly be exercised beyond the limits of its territory.'" (quoting Church v. Hubbart, 6 U.S. (2 Cranch) 187, 234 (1804) (Marshall, C.J.)). As we have explained, however,

> [w]hether Congress has chosen to exercise that authority . . . is an issue of statutory construction. It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.

Neiman v. DryClean U.S.A. Franchise Co., 178 F.3d 1126, 1129 (11th Cir. 1999)

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981.

(quotation marks and citations omitted). "The presumption against extraterritoriality can be overcome only by clear expression of Congress' intention to extend the reach of the relevant Act beyond those places where the United States has sovereignty or has some measure of legislative control." Id. at 1129. See also Morrison v. Nat'l Austl. Bank Ltd., -- S. Ct. --, 2010 WL 2518523, at *5 (June 24, 2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Such an intention of course may appear on the face of the statute, but it may also be "inferred from . . . the nature of the harm the statute is designed to prevent," from the self-evident "international focus of the statute," and from the fact that "limit[ing] [the statute's] prohibitions to acts occurring within the United States would undermine the statute's effectiveness." Plummer, 221 F.3d at 1310.

The language of the Torture Act itself evinces an unmistakable congressional intent to apply the statute extraterritorially. It punishes "[w]hoever outside the United States commits . . . torture." 18 U.S.C. § 2340A(a) (emphasis added). Further, even if the language of the Torture Act were not so remarkably clear, the intent to apply the statute to acts occurring outside United States territory could be inferred along the lines set forth in Plummer, 221 F.3d at 1310. First, the nature of the harm to which the CAT and the Torture Act are directed -- "torture and other cruel, inhuman or degrading treatment or punishment throughout the

45

world," see CAT, pmbl. -- is quintessentially international in scope. Second, and relatedly, the international focus of the statute is "self-evident": Congress's concern was not to prevent official torture within the borders of the United States, but in nations where the rule of law has broken down and the ruling government has become the enemy, rather than the protector, of its citizens. Finally, limiting the prohibitions of the Torture Act to conduct occurring in the United States would dramatically, if not entirely, reduce their efficacy.

In short, all of Emmanuel's substantive convictions under the Torture Act are fully consonant with the United States Constitution.

IV.

Emmanuel also argues that by criminalizing conspiracy to commit torture, the Torture Act exceeded Congress's constitutional authority, because conspiracy, Emmanuel says, is recognized in neither the CAT nor international law. We remain unpersuaded.

Article 4(1) of the CAT explicitly requires that "[e]ach State Party . . . ensure that all acts of torture are offenses under its criminal law," and it provides that "[t]he same shall apply . . . to an act by any person which constitutes complicity or participation in torture." CAT, art. 4(1) (emphasis added). In other words, the CAT specifically instructs its signatories to criminalize not only the act

of torture itself, but also conduct that encourages and furthers the commission of torture by others.  Conspiracy plainly amounts to such conduct.  Indeed, the ordinary meaning of the term "complicity" is "association or participation in," Webster's New Int'l Dictionary 465 (3d ed. 2002); see also Black's Law Dictionary 324 (9th ed. 2004) (defining complicity as "[a]ssociation or participation in a criminal act"), and those notions squarely encompass the acts of conspirators in furtherance of a conspiracy.  Thus, the plain language of the CAT, which controls our analysis, supports Congress's decision to criminalize conspiracies to commit torture in the Torture Act.  18 U.S.C. § 2340A(c).[6]

The only case Emmanuel cites in support of his contrary position is Hamdan v. Rumsfeld, 548 U.S. 557 (2006).  The Supreme Court did conclude in Hamdan that a conspiracy to violate the customary international law of war was not an offense punishable under that body of law in a military commission.  Id. at 601-12.  That conclusion, however, has no bearing on this case.  For one, this case does not concern the law of war.  Even more importantly, this case does not require us to seek justification for the prohibition on conspiracies to commit torture in

_____

[6] Emmanuel's argument is also at odds with our own precedents concerning the CAT.  In holding that claims based on indirect liability are actionable under the Torture Victim Protection Act, we looked to the CAT, which we expressly characterized as one of "several international agreements that contemplate liability under international norms for indirect [crimes]."  Cabello v. Fernandez-Larios, 402 F.3d 1148, 1157 (11th Cir. 2005).  Conspiracy is one such indirect crime.  See id. (characterizing conspiracy as an indirect crime).

47

customary international law, because an express international treaty obligation -- the CAT -- requires its signatories to punish such conduct. Congress did so in the Torture Act.

Emmanuel also suggests that his prosecution for conspiracy went beyond the terms of the Torture Act itself, because all of his alleged acts in furtherance of the conspiracy to commit torture were "governmental self-preservation tactics." That suggestion, however, lacks any merit. The Torture Act prohibits an individual from conspiring to torture and torturing others while acting under the color of law. The indictment against Emmanuel alleged that the object of the conspiracy was to

> maintain, preserve, protect and strengthen the power and authority of Charles McArthur Taylor's presidency, and to intimidate, neutralize, punish, weaken and eliminate actual and perceived opponents of and threats to his administration, by means of torture, in violation of Title 18, United States Code, Sections 2340A and 2340(1).

Superseding Indictment, at 4. As the indictment alleged, and as the evidence amply demonstrated at trial, the goal of Emmanuel's conspiracy was to protect Taylor's power.

More fundamentally, the entire premise of Emmanuel's argument -- that a conspiracy to commit torture is permissible whenever its object is to preserve governmental power -- is unacceptable under the CAT. Official torture is most likely to occur precisely when an illegitimate regime perceives a threat to its

48

dominance from dissenters. In recognition of this reality, the CAT itself unambiguously provides that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." CAT, art. 2(2). The CAT thus anticipated prosecutions such as this one, where torture is committed by a regime in order to maintain its brutal control over an unhappy populace. The conspiracy prosecution here was fully consistent with the mandate that such acts may be prosecuted.

Finally, Emmanuel says that the Torture Act's prohibition on conspiracy cannot apply extraterritorially. However, extraterritorial jurisdiction over a conspiracy charge exists whenever the underlying substantive crime applies to extraterritorial conduct. See United States v. Yousef, 327 F.3d 56, 87-88 (2d Cir. 2003) (citing United States v. Bowman, 260 U.S. 94, 98 (1922), for the proposition that "if Congress intended United States courts to have jurisdiction over [a] substantive crime, it is reasonable to conclude that Congress also intended to vest in United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit that crime."). Because, as we have explained, there is extraterritorial jurisdiction to prohibit torture under the Torture Act, it follows that there is extraterritorial jurisdiction to prohibit conspiracy to commit violations of the

Torture Act as well.

Emmanuel's conviction for conspiracy to commit torture is constitutional, and his acts fell within the proscriptions of the Torture Act.

V.

Emmanuel's next challenge is to his conviction for using and carrying a firearm during and in relation to a crime of violence, pursuant to 18 U.S.C. § 924(c) (Count Eight), a statute which he claims cannot be applied to his extraterritorial conduct. In resolving this issue we address two questions: first, whether the statute can ever apply extraterritorially; and second, whether the district court plainly erred in applying 18 U.S.C. § 924(c) to Emmanuel. We answer the first question in the affirmative, and the second question in the negative. The challenged conviction must stand.

As with Congress's ability to regulate the conduct of United States citizens abroad, it is well established that Congress can regulate conduct outside of the territorial bounds of the United States (not just that of its own citizens), EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, but, again, we assume that Congress does not intend for a statute to apply extraterritorially unless it evinces that intent clearly, Sale, 509 U.S. at 173; see also United States v.

50

Frank, 599 F.3d 1221, 1230 (11th Cir. 2010) ("We presume that statutes only apply domestically, and give extraterritorial effect where congressional intent is clear.") (quotation marks and citation omitted).

In ascertaining the intent of Congress, the plain meaning of the statute controls our interpretation. If the intent of Congress is clear from the face of the statute, we need not look to the legislative history or the rule of lenity. United States v. Maturin, 499 F.3d 1243, 1246 (11th Cir. 2007); United States v. Veal, 153 F.3d 1233, 1245 (11th Cir. 1998) ("Review of legislative history is unnecessary unless a statute is inescapably ambiguous." (quotation marks and citation omitted)); see also Salinas v. United States, 522 U.S. 52, 66 (1997) ("The rule [of lenity] does not apply when a statute is unambiguous . . . .").

Further, "extraterritorial application can be inferred in certain cases even absent an express intention on the face of the statute." Frank, 599 F.3d at 1230. We recently explained this principle, first outlined by the Supreme Court in United States v. Bowman, 260 U.S. 94 (1922), this way:

> We have interpreted Bowman to hold that extraterritorial application may be inferred from the nature of the offense and Congress' other legislative efforts to eliminate the type of crime involved. Crimes fall under the Bowman exception when limiting their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens in foreign countries as at home. Thus, we have upheld extraterritorial application of statutes where the nature

51

of the activities warranted a broad sweep of power.

*Frank*, 599 F.3d at 1230 (quotation marks, citations, and alterations omitted).

Section 924(c)(1)(A) of Title 18 punishes "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." On its face, there is simply no limitation in the language of the statute concerning its application to crimes committed outside of the United States. The statute notably does not apply to any crime of violence "committed in the United States," but instead applies quite broadly to any crime of violence that "may be prosecuted in a court of the United States." Indeed, "[t]he reading offered by [Emmanuel] would require the addition of words that the actual statute does not contain." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1188-89 (11th Cir. 2010).

Moreover, it is generally the rule that "a statute ancillary to a substantive offense statute is presumed to have extraterritorial [effect] if the underlying substantive offense statute is determined to have extraterritorial [effect]." *United States v. Reumayr*, 530 F. Supp. 2d 1210, 1219 (D.N.M. 2008); *see, e.g.*, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1204-05 (9th Cir. 1991) (concluding that the extraterritorial application of 18 U.S.C. § 3, which prohibits being an accessory

52

after the fact of a crime, depends upon the predicate offense). Section 924(c) is plainly an ancillary statute that relies on the existence of a separate substantive crime; here, the substantive crime is torture, and that crime properly has extraterritorial effect.

The plain language of § 924(c) demonstrates that Congress intended the provision to apply to <u>any</u> acts that, under other legislation, may be prosecuted in the federal courts. There is no question that a violation of the Torture Act is a violent crime that "may be prosecuted in a court of the United States."[7] Accordingly, a § 924(c) charge can arise out of extraterritorial conduct that is found to be in violation of the Torture Act.

Emmanuel's reliance on <u>Small v. United States</u>, 544 U.S. 385 (2005), is misplaced. In <u>Small</u>, the Supreme Court held that the phrase "convicted in any court," as used in the federal felon-in-possession statute, excluded convictions entered by foreign courts. <u>Id.</u> at 388-91. The Court rejected the claim that the statute's use of the word "any" was broad enough to include foreign judgments:

> The word "any" considered alone cannot answer this question. In

---

[7] Emmanuel does not argue that torture is not a "crime of violence" under § 924(c). A "crime of violence" is "an offense that is a felony and -- (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . ." 18 U.S.C. § 924(c)(3). Torture is unquestionably a crime of violence; its elements require an act "specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within [the defendant's] custody or physical control." 18 U.S.C. § 2340(1).

ordinary life, a speaker who says, "I'll see any film," may or may not mean to include films showing in another city. In law, a legislature that uses the statutory phrase "any person" may or may not mean to include "persons" outside "the jurisdiction of the state."

Id. at 388. The essential question in Small was whether the word "any," of its own force, could substantively expand the scope of the felon-in-possession statute, allowing it to reach persons who had been deemed criminals under the laws of other nations, but not under the laws of the United States. The breadth of the word "any," the Supreme Court held, was not so great as to overcome the "commonsense notion that Congress generally legislates with domestic concerns in mind." Id. (citation omitted).

In this case, in sharp contrast, the word "any" is not expanding the substantive reach of the statute: the Torture Act, as we have held, plainly applies extraterritorially, and § 924(c), just as plainly, is an ancillary statute that merely enhances the penalty for a predicate offense, such as torture, that is prosecutable in a federal court. There can be no violation of § 924(c) without a predicate offense, and it follows that the statute's reach is determined by the breadth of the predicate offense. Thus, in stark contrast to the circumstance in Small, the word "any" is not called upon to support the enlargement of a federal crime. Indeed, the word "any" in the phrase we interpret here could be replaced by an ordinary indefinite article -- "a crime" -- and the meaning of the statute would be exactly the same. Small does

54

not require a conclusion other than the one that leaps from the face of the statute, namely, that Congress intended to apply § 924(c) extraterritorially when the underlying substantive statute has extraterritorial application.

Emmanuel nevertheless claims that the application of 18 U.S.C. § 924(c) to his conduct is an unconstitutional violation of the Commerce Clause, too. Because he raises this claim for the first time on appeal, we will review it only for plain error. United States v. Peters, 403 F.3d 1263, 1270 (11th Cir. 2005). To establish plain error, Emmanuel must show that there was (1) error, (2) that is plain, and (3) that affects his substantial rights. United States v. Olano, 507 U.S. 725, 732 (1993). If all three requirements are met, we may reverse only if the error also "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (quotation marks and citation omitted). Relief is granted on plain error review only "sparingly[,] and only in those circumstances in which a miscarriage of justice would otherwise result." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quotation marks and citations omitted).

We have held repeatedly that § 924(c), on its face, is a constitutional exercise of Congress's power under the Commerce Clause. See Ferreira, 275 F.3d at 1028. In Ferreira, moreover, we explained that the Supreme Court's decisions in United States v. Lopez, 514 U.S. 549 (1995), Jones v. United States, 529 U.S. 848

55

(2000), and <u>United States v. Morrison</u>, 529 U.S. 598 (2000), did not alter our holding that Congress was authorized under the Commerce Clause to enact § 924(c).  See <u>Ferreira</u>, 275 F.3d at 1028; <u>United States v. DePace</u>, 120 F.3d 233, 235 n.2 (11th Cir. 1997) (agreeing with courts that have rejected the idea "that 18 U.S.C. § 924(c) is an unconstitutional effort to regulate intrastate, non-economic activity").  We similarly reject Emmanuel's facial challenge to the constitutionality of § 924(c).

Emmanuel further argues that § 924(c) is unconstitutional as applied to him, claiming that it cannot be applied extraterritorially to a crime of violence that is authorized by an enumerated power other than the commerce power.  Here, as we have held, the "crime of violence" defined in the Torture Act is authorized by the Treaty Clause, as implemented through the Necessary and Proper Clause.  No court, however, has previously addressed this constitutional question.  Because there is no case law, binding or otherwise, that indicates whether a "crime of violence" created pursuant to a constitutional provision other than the Commerce Clause can be the basis of a § 924(c) conviction, the district court could not have plainly erred in failing to strike the § 924(c) count from Emmanuel's indictment as unconstitutional.  See <u>United States v. Chau</u>, 426 F.3d 1318, 1322 (11th Cir. 2005) (when "the explicit language of a statute or rule does not specifically resolve an

56

issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it").

VI.

Having exhausted the Constitution as a source of relief from his convictions, Emmanuel attacks them on the ground that multiple trial errors, in the aggregate, violated his right to a fair trial. We are unpersuaded.

As this Court has explained, evidentiary errors are not grounds for reversal "unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Drury, 396 F.3d 1303, 1315 (11th Cir. 2005) (quotation marks and citations omitted). We will address each of Emmanuel's individual claims of error in turn.

A.

First, Emmanuel claims that the district court abused its discretion in admitting, pursuant to Fed. R. Evid. 801(d)(1) and over his objection, numerous prior out-of-court hearsay statements by torture victims Kpadeh and Dulleh that described Emmanuel's commission of the acts alleged in the indictment.

Rule 801(d)(1) provides that a statement is not hearsay if

57

> [t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

Fed. R. Evid. 801(d)(1). "[P]rior consistent statements are treated as admissible non-hearsay only if they are offered to rebut a specific allegation of recent fabrication, not to rehabilitate credibility that has been generally called into question." Drury, 396 F.3d at 1316 (emphasis omitted). Also, a prior consistent statement is admissible only if it was "made before the alleged influence, or motive to fabricate, arose." Tome v. United States, 513 U.S. 150, 158 (1995). The district court has "broad discretion in determining the admissibility of a prior consistent statement under Fed. R. Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." United States v. Prieto, 232 F.3d 816, 819 (11th Cir. 2000).

Emmanuel argues that Kpadeh's and Dulleh's motives to lie about his conduct arose in the 1990s when both men were attempting to flee Liberia, not more recently, as the district court found. In his opening statement at trial, however, Emmanuel stated that the victim-witnesses, including Kpadeh, wished to convict Emmanuel so that they could receive money through certain unspecified lawsuits and from Liberia's Truth and Reconciliation Commission. Emmanuel

58

began his cross-examination of Kpadeh by questioning him about his motivation to sue Emmanuel or seek redress from the Truth and Reconciliation Commission, linking those prospects with Kpadeh's decision to retain counsel in 2007. Emmanuel also implied during that same cross-examination that Kpadeh could have, but failed to, complain to the United States embassy in 1999 about his alleged torture.

It was in response to Emmanuel's opening statement and cross-examination that the district court allowed the government to present testimony from Kpadeh's half-brother, who said that Kpadeh told him in October 1999 that he had been arrested, taken to Gbatala Base, and tortured by ATU soldiers. That prior consistent statement preceded the alleged financial motive Emmanuel claimed Kpadeh had to lie, which arose in 2007; there was no evidence that Kpadeh believed that he could sue Taylor or Emmanuel in 1999, and Kpadeh did not obtain a lawyer until 2007. Yet, in 1999, he told his half-brother about the atrocities he endured at the hands of Emmanuel. Under these circumstances, the district court did not abuse its considerable discretion in determining that Emmanuel had opened the door to Kpadeh's use of a prior consistent statement.

Dulleh's prior consistent statements -- which consisted of the testimony of multiple witnesses that, after being placed in the prison pits at Klay Junction,

59

Dulleh told his fellow prisoners how he was tortured -- were admissible under both Rule 801(d)(1)(B) and 803(2).

First, Dulleh's prior consistent statements were used to rebut the implication Emmanuel sought to create that Dulleh had a recent motive to fabricate. Emmanuel said in his opening statement that some of the victim-witnesses had a motive to lie because they had "serious medical conditions" that "left untreated will probably mean their death in Liberia." On cross-examination, Emmanuel elicited from Dulleh that he is HIV-positive and suggested that Dulleh wanted to leave West Africa to seek medical treatment and avoid discrimination. But Dulleh did not learn that he was HIV positive until 2005, whereas he made the statements in the Klay Junction prison pits in 2002. Thus, the admitted statements were consistent prior statements made before the recent alleged motive to lie -- the HIV diagnosis -- arose.

Second, Dulleh's prior consistent statements were also admissible as excited utterances under Rule 803(2). A hearsay statement is admissible under Rule 803(2) if it is one "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). While the declarant must still be under the stress or excitement that the startling event caused, the excited utterance need not be made

60

contemporaneously to the startling event. It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance. See United States v. Cruz, 156 F.3d 22, 30 (1st Cir. 1998) (finding a statement was an excited utterance when it was made four hours after the startling event because it is likely that the victim continued to suffer trauma because she was unable to escape the location where the assault occurred); United States v. Scarpa, 913 F.2d 993, 1016-17 (2d Cir. 1990) (finding a statement was an excited utterance when it was made five or six hours after the event where the record demonstrated that the declarant was still under stress at the time he made the statement); Gross v. Greer, 773 F.2d 116, 119-20 (7th Cir. 1985) (finding that the district court properly admitted a statement made twelve hours after the startling event).

Here, Dulleh made his statements to the other prisoners at Klay Junction four to five hours after he had initially been assaulted and placed in the prison pits with them. Emmanuel says the time lapse was too great, but given the totality of the surrounding circumstances, the district court did not abuse its discretion in finding that Dulleh was still under the stress of excitement when he told his fellow prisoners about the torture he had endured. All three of the witnesses who testified about Dulleh's prior consistent statements said that Dulleh was distressed when he

61

arrived at Klay Junction and when he made the statements. Dulleh had been kidnapped from his home by armed ATU soldiers, interrogated, and brought to Taylor's personal residence. While at the residence, he had been beaten, burned, branded, and told that he would be killed. Emmanuel also had electrocuted him with a cattle prod and put a gun to his head. It was after this sequence of horrific events that Dulleh spent another four to five hours in ATU custody while being transported to an unknown location, where he was then left to wait. There can be little question that Dulleh remained in fear for his safety and his life from the time he endured the initial abuse at Taylor's residence through the time he was deposited in the prison pit at Klay Junction. Thus, it was not an abuse of discretion for the district court to find that the statements Dulleh made at Klay Junction about his torture were excited utterances and not inadmissible hearsay.

B.

Emmanuel also says that the district court abused its discretion in admitting, pursuant to Federal Rule of Evidence 803(4), portions of the victims' medical records, because those records both suggested that Emmanuel was responsible for the victims' injuries and used terms such as "torture" and "abuse."

First, Emmanuel objects to Kpadeh's recorded statement to a medical professional that he was imprisoned and tortured for two months by the ATU.

62

However, as we have already explained, Kpadeh's 1999 statement is admissible as a prior consistent statement under Rule 801(d)(1)(B). Thus, any error in admitting this medical record containing the same information from the same time period was harmless.

Second, Emmanuel objects to the admission of Miami-Dade County Medical Examiner Dr. Bruce Hyma's testimony that Dulleh told him that Emmanuel, Taylor, and a general threatened to kill him. Even if the district court erred in admitting this statement, the error was harmless. Dulleh himself testified that Emmanuel threatened to kill him and Dulleh's admissible prior consistent statements confirmed this fact.

Third, Emmanuel claims that the district court abused its discretion in refusing to redact terms in the victims' medical records such as "abuse" and "torture." Rule 803(4) instructs that

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment[, are admissible hearsay].

Fed. R. Evid. 803(4). The advisory committee notes explain that this Rule

> also extends to statements as to causation, reasonably pertinent to [purposes of diagnosis and treatment], in accord with the current trend. Statements as to fault would not ordinarily qualify under this latter language. Thus a patient's statements that he was struck by an

63

automobile would qualify but not his statement that the car was driven through a red light.

Fed. R. Evid. 803(4) advisory committee's notes (citations omitted).

The statements by the medical professionals in this case that the victims' wounds and burns were the result of abuse or torture (as opposed to, for example, a vehicular or workplace accident) were statements of causation. See United States v. Iron Thunder, 714 F.2d 765, 772-73 (8th Cir. 1983) (holding that a statement that a victim was "raped" in her medical records was a statement as to causation, not fault). These records do not assign any fault for the abuse or torture, nor do they insinuate impermissibly that the "abuse" or "torture" satisfied any particular statutory or legal definition of those terms. The district court did not abuse its discretion in admitting the unredacted medical records into evidence.

## C.

Emmanuel also claims, on two grounds, that the district court abused its discretion in admitting rap lyrics referring to the ATU, and violence, that were found in a notebook in Emmanuel's suitcase at the time of his arrest at the Miami International Airport on March 30, 2006. First, he argues that the document containing the lyrics was not properly authenticated under Rule 901(b). Second, he says that the lyrics were irrelevant and unduly prejudicial. Both arguments are unpersuasive.

64

First, the document was properly authenticated. The list of methods in Fed. R. Evid. 901(b) by which a document can be authenticated is non-exclusive, and authentication itself is "merely . . . the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be." United States v. Caldwell, 776 F.2d 989, 1002 (11th Cir. 1985). Once that prima facie case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury. Id.

A prima facie case of authenticity was established for the rap lyrics in two ways. First, the lyrics were found in Emmanuel's possession, bore signatures corresponding to two of his primary aliases -- "Charles McArthur Emmanuel" and "Charles Taylor, II" -- and alluded to his birth in Massachusetts and upbringing in Florida, stating: "From the north, but I ride wit Floridian tacts." See United States v. Munoz, 16 F.3d 1116, 1121 (11th Cir. 1994) (holding that there was no abuse of discretion in district court's finding of authentication where subject documents bore defendant's signatures and were found in his possession).

Second, a customs inspector testified that, prior to coming into court, he had compared the signature in the notebook containing the lyrics to the signature appearing on the passport that the inspector had seized from Emmanuel. He testified that the two signatures were "identical." When Emmanuel was arrested at

65

the Miami International Airport, the verification of his passport was not done "in the course of prosecution," as he now alleges, but instead as part of the customs procedure to which every individual disembarking from an international flight must submit. Thus, the comparison was proper under Fed. R. Evid. 901(b)(2).

Moreover, the rap lyrics were relevant and their probative value was not outweighed by any unfair prejudice that might have arisen from their admission into evidence. Specifically, the lyrics stated such things as: "Take this for free, six feet is where you gonna be. ATU niggas on the scene. Body bag is all you see"; "More sweat in my training means less blood in my life. So with the shots from guns keep it dead and precise. Bull-doze ambushes in the midst of a fight. Try to cut my supply, you'll be losing your life"; and "army thugs united." Such lyrics were probative on multiple fronts. First, by referring to the ATU, the lyrics provided evidence of Emmanuel's association with and continued identification as a member of the ATU. Both of those facts were relevant to the indictment's allegation that Emmanuel was associated with the ATU. Indeed, the lyrics were particularly probative given Emmanuel's repeated assaults on the credibility of the government's principal witnesses who testified about Emmanuel's control over the ATU. Second, the lyrics make multiple references to the violence caused by the ATU, which contradicts Emmanuel's post-arrest statements that he had never seen

66

the ATU beat or kill anyone and, again, supports the credibility of the witnesses who testified about the ATU's and Emmanuel's repeated commission of atrocities.

D.

Emmanuel's cursory argument that the district court improperly admitted the testimony of Wesley Sieh, an ATU soldier, is without merit. Sieh testified about conversations he had with former NPFL commander Siafa Normah regarding the formation of the ATU. He said that Normah told him that the ATU would train and be responsible for guarding the Executive Mansion, Taylor, and his family; that Normah told him that Emmanuel was the head of the ATU; and that Normah said that Emmanuel had asked Normah to recommend men to recruit for the ATU. Sieh also testified about the abuse and torture to which the ATU recruits were subjected as punishment, often alongside the ATU's prisoners.

It was not improper for the district court to admit Sieh's testimony about Normah's statements regarding Emmanuel's instructions on the formation of the ATU. Under Fed. R. Evid. 801(d)(2)(C), this testimony was an admission by a party-opponent; it was a "statement by a person authorized by the party to make a statement concerning the subject," and thus was admissible hearsay. Fed. R. Evid. 801(d)(2)(C). In particular, Normah's statements to Sieh were admissible because they concerned the same matter for which Emmanuel was employing Normah,

67

namely, to recommend men for the ATU. Put differently, Emmanuel hired Normah to find him soldiers to form the ATU. Normah then, in the process of finding ATU recruits, asked Sieh, an experienced Liberian soldier in Taylor's army, to join the ATU on Emmanuel's behalf. The district court did not abuse its discretion in admitting this evidence.

Further, as the district court found, Sieh's description of the horrifying punishments imposed on the ATU soldiers was relevant to the government's case. In particular, his testimony provided an explanation as to how Emmanuel was able to force the ATU soldiers into carrying out his orders to torture others. The testimony also demonstrated Emmanuel's position as a superior to the ATU soldiers. In addition, many of the tactics used to punish disobedient ATU soldiers were the same as those used to torture the prisoners. Thus, for example, both the punished soldiers and Emmanuel's victims were required to "run the rim," again, an exercise in which the subject would run in a large circle around posts, all the while carrying on one shoulder a heavy log that was struck repeatedly with a heavy metal rod. In short, Sieh's testimony also corroborated the testimony of other government witnesses and showed that Emmanuel was aware of the methods of torture he was alleged to have employed on his victims.

E.

68

Nor did the district court abuse its discretion in admitting a number of other statements that Emmanuel now calls to our attention as inadmissible hearsay. Emmanuel objected, for one, to the testimony of Pete Davis, a Liberia Desk Officer at the U.S. Department of State. Davis described generally the political parties in Liberia, and specifically characterized the Union Party (to which one of Emmanuel's victims belonged) as non-violent. Davis's testimony concerned nothing more than historical background about Liberia and its political structure, as necessary to educate the jury. As such, the testimony was admissible pursuant to Fed. R. Evid. 803(20) as hearsay concerning the "[r]eputation in a community, arising before the controversy, as to boundaries of or customs affecting lands in the community, and reputation as to events of general history important to the community or State or nation in which located." Fed. R. Evid. 803(20).

In his brief, Emmanuel also offers six alleged examples of hearsay in a bullet-pointed list, but he fails to explain in any manner why those statements should not have been admitted. We routinely decline to address such cursory arguments, and this case presents no exception. See United States v. Gupta, 463 F.3d 1182, 1195 (11th Cir. 2006) ("We may decline to address an argument where a party fails to provide arguments on the merits of an issue in its initial or reply brief. Without such argument the issue is deemed waived.").

69

F.

Emmanuel also claims that the district court abused its discretion by not making an interpreter available during one day of his presentation of evidence. We again discern no error.

On the eighteenth day of trial, which was also the first day of Emmanuel's defense, the interpreter, who was used to assist the jury in understanding the heavily-accented English spoken by some of the Liberian witnesses, lost his voice. Emmanuel requested a brief continuance to allow the interpreter to rest his voice, but the district court denied the request. Instead, the district court instructed the jurors that the translator had lost his voice and that they should raise their hands if they did not understand the testimony. The district court stopped the testimony at four points in the course of a day's testimony where an answer was unintelligible to the court.

"The appointment of an interpreter, both under the Court Interpreters Act[, 28 U.S.C. § 1827,] and as a constitutional matter, is committed to the sound discretion of the trial judge." United States v. Edouard, 485 F.3d 1324, 1337 (11th Cir. 2007). We therefore review a district court's determination as to the use of an interpreter for an abuse of discretion, which, in this particular context, amounts to an "inquiry on whether . . . the failure to provide an interpreter . . . made the trial

fundamentally unfair." United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980).

On this record, we cannot say that the absence of a fully functioning interpreter for part of a single trial day rendered Emmanuel's trial fundamentally unfair. For one, the witnesses all spoke English, albeit in some cases with a heavy Liberian accent. In the second place, although the interpreter was unable to provide continuous translation, he remained in the courtroom throughout the day and continued to assist the court and counsel with instances of unclear testimony. The district court, for its part, noted that it was "paying very close attention," and that it would "interrupt if [it] d[idn't] understand." Third, the court instructed the jurors to raise their hands if they did not understand the testimony. None of them did so. Finally, at four points at which the testimony nonetheless might have been difficult to understand, the court interrupted the witness and asked for clarification. At two of these points, the witness clarified his answer. In a third instance, the interpreter provided clarification. And, in a fourth instance, the interpreter intervened after the witness attempted unsuccessfully to clarify his own answer. In no instance after the clarification was offered did a juror raise his or her hand indicating that he or she did not understand any answer. Nor did the district court seek any further clarification. After reviewing the manner in which the district

71

court chose to address this issue, we can discern no reversible error or fundamental

unfairness.

G.

The district court also did not plainly err, as Emmanuel claims, in failing to

instruct the jury that it must find, as an element of the offense of torture, that the

conduct was not incidental to a lawful sanction. Because Emmanuel did not object

to the relevant jury instructions, we review this claim only for plain error. United

States v. Peters, 403 F.3d 1263, 1270 (11th Cir. 2005). We can discern no error,

let alone error that was plain.

The Torture Act defines torture as "an act committed by a person acting

under the color of law specifically intended to inflict severe physical or mental

pain or suffering (other than pain or suffering incidental to lawful sanctions) upon

another person within his custody or physical control." 18 U.S.C. § 2340. The

district court gave the following relevant instruction:

> Torture means an act committed by a person, acting under the color of
> law, specifically intended to inflict severe physical pain or suffering
> (other than pain or suffering incidental to lawful sanctions) upon
> another person within his custody or physical control. Lawful
> sanctions include judicially imposed sanctions and other enforcement
> actions authorized by law, including the death penalty, but do not
> include sanctions that defeat the object and purpose of the law
> prohibiting torture.

> The defendant can be found guilty of that offense only if all of the

72

following acts are proved beyond a reasonable doubt:

First:    That the defendant committed an act with the specific intent to inflict severe physical pain or suffering;

Second:   That the defendant was acting under the color of law;

Third:    That the act of torture was against another person who was within the Defendant's custody or physical control; and

Fourth:   That the act of torture occurred outside the United States.

The jury was instructed concerning all of the requirements of the offense of torture, and in the very first sentence of the definition of torture provided to the jury, the district court specified that the subject pain or suffering could not be incidental to lawful sanctions. The district court then defined the phrase "lawful sanction." That the jury instruction did not repeat and emphasize that portion of the definition a second time does not render the instruction erroneous. See United States v. Klein, 543 F.3d 206, 211-12 (5th Cir. 2008) (explaining that an instruction was not erroneous because, although not expressly identifying a particular clause as an element of the crime, its description of that element closely followed the instructions regarding the other explicitly labeled elements of the crime); United States v. Martin, 704 F.2d 515, 518 (11th Cir. 1983) (noting that "[t]he mere failure to recite the jury instructions in the precise language requested by defendant is not error where . . . the instructions are otherwise sufficient," and approving instruction that "track[ed] the language of the statute" (citation and

73

quotation marks omitted)).

H.

Emmanuel next argues that his convictions should be overturned because the district court erred in failing to compel the government to produce then-classified Department of Justice memoranda that defined torture and described the limits of lawful interrogation techniques (the "Torture Memos"). Yet, in seeking to compel production of those classified documents, Emmanuel never explained how they would assist him in his own case. He does not claim that he relied on the classified memoranda in determining whether to commit his acts of torture, nor is it clear how any of his conduct -- which included acts of branding, scalding, severe beating, decapitation, the administration of electrical shocks, and the extended confinement of individuals with infected wounds in rancid water-filled pits -- is in any way similar to the conduct described in the Torture Memos, which discuss waterboarding and exposure to extreme temperatures.

Nor is it clear why Emmanuel would have needed those classified documents to define the meaning of the term torture as it is used in the Torture Act. The Torture Act contains a specific and unambiguous definition of torture that is derived from the definition provided in the CAT. The language of that statute -- not an executive branch memorandum -- is what controls the definition of the

crime. Accordingly, the Torture Memos were, as the district court found, irrelevant to Emmanuel's defense.

## VII.

Finally, Emmanuel argues that his 1,164 month sentence is invalid for multiple reasons. We are unpersuaded.

In reviewing the district court's Sentencing Guidelines calculation, we review the findings of fact for clear error and the application of the Sentencing Guidelines to those facts de novo. United States v. Anderson, 326 F.3d 1319, 1326 (11th Cir. 2003). In particular, we review de novo "whether the district court applied the correct sentencing guideline (or subsection of a sentencing guideline) for the defendant's underlying conduct." United States v. Davidson, 360 F.3d 1374, 1376 (11th Cir. 2004) (citation omitted). But, where the legal question of whether the district court applied the correct guideline is "fact-bound," we review that legal determination for clear error, because the district court has greater expertise at sentencing, and there is generally limited precedential value in the decision. United States v. White, 335 F.3d 1314, 1318 (11th Cir. 2003). The government bears the burden of proving the applicability of a guideline section that would enhance a defendant's offense level. United States v. Askew, 193 F.3d 1181, 1183 (11th Cir. 1999).

## A.

First, Emmanuel says that the district court committed reversible procedural error when it calculated his Sentencing Guidelines range under the 2002 Sentencing Guidelines Manuel. In particular, he claims that the district court erred in using the kidnapping guideline, U.S.S.G. § 2A4.1, and the murder cross-reference it authorizes under § 2A4.1(c), because he did not unlawfully detain his victims, the murders did not result from torture, and he was neither charged with nor convicted of kidnapping or murder.

The district court, adopting the PSI over Emmanuel's objection, calculated Emmanuel's guidelines range as follows. Count One, the conspiracy count, involved ten victims; the district court created ten sentencing groups to correspond to those ten victims and then incorporated Emmanuel's convictions on Counts Two through Seven into the applicable victim group. For the sentencing groups for Conteh, Jusu, Turay, Kpadeh, Dulleh, and Kamara, § 2A4.1, which is the guideline for kidnapping, was applied to calculate the appropriate base offense level. For the sentencing groups for Williams and the two unidentified refugees who were shot and killed at the St. Paul River Bridge Checkpoint, § 2A4.1(c)'s cross-reference to the first-degree murder guideline in § 2A1.1 was applied to calculate the appropriate base offense level. These calculations yielded an overall offense level

76

of 43, which directed a Guidelines range of life imprisonment.

Under the Guidelines, a district court arrives at the appropriate offense level through a two-step process. First, the district court must determine which offense guideline section covers the offense of conviction. U.S.S.G. §§ 1B1.1(a), 1B1.2(a); United States v. Saavedra, 148 F.3d 1311, 1314 (11th Cir. 1998). To determine the applicable offense guideline, the court must identify "the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). When more than one guideline is referenced in the Statutory Index of the Sentencing Guidelines as being applicable to a violation of a particular statute, then the district court is directed to apply "the guideline section most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. app. A, intro; Davidson, 360 F.3d at 1377.

Second, once the correct offense section has been identified, the district court must then determine the appropriate Guidelines range under that section based on the defendant's actual conduct, which may include conduct that was not an element of the offense of conviction. U.S.S.G. §§ 1B1.2(b), 1B1.3; Saavedra, 148 F.3d at 1314. In particular, the court may consider the defendant's relevant conduct -- all acts that occurred during the commission of the offense -- if that relevant conduct was established by a preponderance of the evidence. U.S.S.G. §

1B1.3; Saavedra, 148 F.3d at 1314.

Emmanuel was convicted of torture and conspiracy to commit torture, in violation of 18 U.S.C. § 2340A. Sentencing Guidelines Appendix A states that the following guidelines may be applied to violations of § 2340A: § 2A1.1, which includes first degree murder; § 2A1.2, which covers second degree murder; § 2A2.1, which includes assault with intent to commit murder and attempted murder; § 2A2.2, which covers aggravated assault; and § 2A4.1, which covers kidnapping. U.S.S.G. app. A. The district court did not err in determining that § 2A4.1 was the most appropriate guideline for the offense conduct of which Emmanuel was convicted.

Count One charged Emmanuel with conspiring to commit torture. Torture requires, as an element, that the defendant have custody or physical control over the victim. 18 U.S.C. § 2340(1). Kidnapping is one method of obtaining and maintaining custody or physical control over another. Count One of Emmanuel's indictment alleged that the manner and means of the conspiracy to commit torture included "seiz[ing], imprison[ing] at various locations, and interrogat[ing] persons" about their alleged opposition to Taylor's rule over Liberia. The indictment also alleged that, in furtherance of the conspiracy, victims were seized and taken against their will to locations of detention while being tortured, and then were repeatedly

78

tortured at those locations. Thus, Kpadeh was held at Gbatala Base for months while he was routinely terrorized and tortured, and Dulleh was confined in various locations, including an abandoned outhouse, for nearly a year. This charged seizure and detention of his victims enabled and facilitated Emmanuel's acts of torture, thus the application of the kidnapping guideline, which itself recognizes that kidnapping can occur "during the commission of, or in connection with, another offense," was entirely proper. U.S.S.G. § 2A4.1(b)(7). Indeed, the kidnapping guideline is particularly appropriate in cases of torture, such as this case, where there are repeated, severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse.

The kidnapping guideline takes into account the gravity of the victim's injuries, whether a dangerous weapon was used, the length of the unlawful detention, and whether the victim was sexually exploited or killed -- all of which are circumstances relevant to determining the proper degree of punishment for Emmanuel's crimes, and none of which are considered under the other applicable guidelines for Torture Act convictions. U.S.S.G. § 2A4.1(b), (c); United States v. Kuku, 129 F.3d 1435, 1439-40 (11th Cir. 1997) (explaining that a guideline section is correctly applied when it covers more circumstances relevant to the conduct for which the jury convicted the defendant than any other guideline section).

We also reject Emmanuel's claim that he did not kidnap any of his victims. On this record, taken in a light most favorable to the jury verdict, the evidence showed that even if Emmanuel's victims were initially detained under lawful circumstances, the extended length and nature of their detention, coupled with the utter lack of access to courts, attorneys, or any information about their arrest, rendered the duration of their imprisonment wholly unlawful. See United States v. Adams, 83 F.3d 1371, 1373-74 (11th Cir. 1996) (citing United States v. Healy, 376 U.S. 75, 82 (1964)) (explaining that the federal kidnapping statute did not require that the purpose of the kidnapping be illegal). And, in fact, there is absolutely no evidence in this record even suggesting that the seizure of Emmanuel's victims was lawful, or that any of his victims had violated, or were even suspected of violating, Liberian law. Instead, Jusu, Turay, and the other refugees were seized at a checkpoint because they were from Sierra Leone; Kpadeh was seized because he was a member of the non-violent Unity Party and refused to join the ATU; Dulleh, a university student, was arrested in his home, in the middle of the night; and Kamara was never told the reason for his arrest.

Not one of these victims was ever charged with a crime or brought before a court, and not one was given access to a lawyer, even though the Liberian courts were open and operating. The victims were transported to secret and remote

80

locations, including the prison pits at Gbatala Base, the underground prison pits at Klay Junction, a military officer's garage, and an abandoned outhouse. Those are not the places of lawful detention. Indeed, the arrest and detention of the victims in inhumane conditions against their will was certainly an integral part of their torture. And, as the CAT itself provides in Article 2(2), claims of exigency or official justification can never be a defense to torture. The district court did not err in applying the kidnapping guideline in calculating Emmanuel's advisory guidelines range.

Nor did the district court err in applying the murder cross-reference in calculating the range applicable to the victim groups for Williams, Cole, and two other unidentified victims. Once the proper guideline section has been determined -- here § 2A4.1 -- the defendant's relevant conduct must be considered in evaluating whether any additional cross-references must be applied to calculate his base offense level. Saavedra, 148 F.3d at 1317. Under § 2A4.1(c), if the victim of a kidnapping is killed under circumstances that would constitute murder under 18 U.S.C. § 1111, the defendant's base offense level is 43. U.S.S.G. § 2A4.1(c) (cross-referencing U.S.S.G. § 2A1.1 base offense level for first degree murder). Murder is defined as "the unlawful killing of a human being with malice aforethought" and "every murder . . . committed in the perpetration of, or attempt to perpetrate, . . .

81

kidnapping . . . is murder in the first degree."  18 U.S.C. § 1111(a).  In other words, 18 U.S.C. § 1111(a) is applicable wherever a victim for whom the defendant is being sentenced under U.S.S.G. § 2A4.1 is also murdered.  Moreover, the Torture Act itself instructs that "if death results to any person from conduct prohibited by this subsection," that person "shall be punished by death or imprisoned for any term of years or for life." 18 U.S.C. § 2340A(a).

In this case, the cross-reference is warranted.  The four murders satisfied U.S.S.G. § 2A4.1(c) and constituted relevant conduct under § 1B1.3(a), because they all occurred in the course of and in furtherance of the conspiracy to commit torture.  At the same checkpoint where Jusu, Turay, and other torture victims were kidnapped to be subjected to future torture, Williams and the two unidentified victims were shot after they refused to answer Emmanuel's questions concerning their suspected rebel ties.  Those initial killings were used to initiate the terrorization, control, and subjugation of the victims.  Emmanuel told the other captured victims that they would be next and the severed heads of the murder victims were prominently displayed atop stakes at the St. Paul River Bridge Checkpoint.

Undoubtedly, an essential part of Emmanuel's and his co-conspirators' scheme to maintain physical control and custody over their victims was to

82

intimidate them with random killings. Cole, for example, was publicly decapitated after he was recaptured following his escape from Gbatala Base; prior to that failed escape, Cole had been detained against his will in inhumane conditions, and had been bound, beaten, and repeatedly abused at the hands of Emmanuel. As with the murders of Williams and the two unidentified victims at the checkpoint, the public and violent murder of Cole as a punishment for his escape served to terrorize and further subjugate Emmanuel's other victims who were imprisoned at Gbatala Base.

Accordingly, Emmanuel's sentence was procedurally reasonable; the district court did not err in calculating his base offense level under the advisory Sentencing Guidelines.

B.

Second, Emmanuel argues that his sentence violates his Fifth and Sixth Amendment rights to notice and due process, to have a grand jury issue an indictment upon a finding of probable cause, to a trial by a jury, to a conviction only upon proof beyond a reasonable doubt of every element of the offense, and to effectively defend and confront the evidence against him. The basis of these claims appears to be that his sentence rested on the "unproven allegations" of kidnapping and murder, as opposed to his offenses of conviction, torture, and conspiracy to commit torture. Again, we are unconvinced.

83

The district court correctly treated the Guidelines as advisory in accordance with United States v. Booker, 543 U.S. 220 (2005). Under an advisory guidelines regime, judicial fact-finding about relevant conduct that supports a sentence within the statutory maximum set forth in the United States Code does not violate the Sixth Amendment. Id. at 233; Chau, 426 F.3d at 1324. Indeed, in evaluating the factors that a court must consider at sentencing, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; see also United States v. Faust, 456 F.3d 1342, 1348 (11th Cir. 2006) (noting that "18 U.S.C. § 3661 . . . remains intact post-Booker"). Thus, it was within the district court's powers to examine the relevant conduct contained in the PSI -- which included multiple acts of kidnapping and murder -- in calculating the applicable guidelines range. There was no constitutional violation here.

C.

Third, and finally, Emmanuel contends that his sentence is invalid because the CAT prohibits the district court from sentencing him for acts other than torture; in other words, he says that his sentence is unconstitutional because it goes beyond the bounds of the CAT. This argument falters at its first step because Emmanuel

was sentenced only for committing torture. As we explained above, Emmanuel was not sentenced for kidnapping. He was not sentenced for murder. He was sentenced for violating the Torture Act. The Sentencing Guidelines instructed the district court to use the same sentencing range for a violation of the Torture Act as the range applicable to a conviction for kidnapping. Similarly, the murders Emmanuel committed were used by the district court only to assist it in calculating the applicable advisory guidelines range for torture. The abductions, murders, and other characteristics of his crime were simply considered by the district court as relevant conduct used to fashion the appropriate punishment for his atrocities.

Further, nothing in the CAT precludes the sentencing rubric imposed by the Sentencing Guidelines for violations of the Torture Act. Article 4(2) of the CAT only requires that each signatory nation make torture offenses "punishable by appropriate penalties which take into account their grave nature." The United States Code, for its part, provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. When implementing the CAT, Congress surely had the power to apply the Sentencing Guidelines to violations of the Torture Act, just as they apply to every other

85

violation of the federal criminal code. See Mistretta v. United States, 488 U.S. 361, 412 (1989).

The CAT also does not prevent the United States from punishing acts that would constitute torture or attempts to commit torture -- both of which undeniably would include kidnappings that occur in furtherance of torture. Indeed, the plain language of 18 U.S.C. § 2340A provides that attempts to commit torture are punishable. Put differently, for Emmanuel to successfully inflict severe and repeated beatings, burnings, shockings, and brandings on his victims, he needed to kidnap those victims so as to have them readily at his disposal. Moreover, the conditions in which he forced his kidnapped victims to live -- in water- and corpse-filled pits with little or no clothing, and with festering wounds and burns -- were themselves torture. Similarly, the murders of Cole, Williams, and the two unidentified refugees were used to facilitate the torture of Emmanuel's other victims. As we have already explained, a central purpose of the murders was to intimidate the other detainees, and thereby deter them from attempting escape or resisting their torture. In short, the kidnappings and murders were punishable under the explicit terms of the CAT, because, at the very least, they amount to attempts to commit torture and acts in furtherance of torture.

VIII.

In sum, we affirm Emmanuel's convictions and sentence in full. The Torture Act's proscriptions against both torture and conspiracy to commit torture are constitutional, and may be applied to extraterritorial conduct. The district court did not plainly err in applying § 924(c) to Emmanuel's extraterritorial conduct, nor in its conduct of this lengthy trial. Finally, Emmanuel's advisory Sentencing Guidelines range was correctly calculated by the district court, and the sentences imposed violate neither the CAT nor the Constitution.

**AFFIRMED**.