

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0677-22

---

### LARRY JEAN HART, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

---

McClure, J., delivered the opinion of the Court in which Hervey, Richardson, Newell, and Walker, JJ., joined. Richardson, J., filed a concurring opinion in which Hervey and Newell, JJ., joined. Keller, P.J., filed a dissenting opinion in which Yeary, Keel and Slaughter, JJ., joined. Yeary, J., filed a dissenting opinion in which Keller, P.J., and Keel, J., joined. Keel, J., filed a dissenting opinion in which Keller, P.J. and Yeary, J., joined.

### O P I N I O N

Did the trial court abuse its discretion by admitting rap videos during the guilt phase of trial to show the defendant's character and sophistication where their prejudice outweighs their proposed use? Yes. In this case, any probative value of the rap videos and lyrics was outweighed by the overwhelming potential for prejudice and confusing the issues. We reverse the judgment of the court of appeals and remand to the trial court for proceedings consistent with this opinion.

BACKGROUND

On June 21, 2017, Appellant drove an acquaintance, who he claimed only knew by the nickname "Mondo,"[1] and three other individuals[2] unknown to him to an apartment complex in Dallas where the complainant, Michael Gardner, lived. As of the day of trial, the identity of the other passengers in Appellant's vehicle were unknown. Appellant testified that he remained in the car with his four-way flashers on while the passengers robbed the complainant and shot him to death. However, surveillance video from a parking lot behind complainant's apartment shows four people entering the complainant's apartment. Further, a 9-1-1 caller said four people were running from the apartment. The State charged Appellant with capital murder while committing or attempting to commit the felony offense of burglary.

According to Appellant's statements to police and at trial, when Appellant was at an apartment complex visiting his godbrother, Mondo asked Appellant for the ride and told

---

[1] Also referred to in the record and at trial as "Little Partner," or "Little Mon."
[2] During the interview by police, Appellant told Detective Pedro Trujillano that he only drove three people to the apartment. At trial, Appellant testified that he was driving, there was someone in the passenger seat and two people in the back.

Appellant that they were going to "break in" to Mondo's uncle's house. Although Appellant was unable to explain another reason for the trip, he denied believing Mondo that the four were going to "break in" to the apartment. Appellant's theory at trial largely comported with his initial statements to law enforcement: he gave a ride to some individuals as a favor but had no idea the group planned to commit a robbery or murder.

Appellant testified at trial to this effect. When Appellant's counsel began to ask whether the fact he called one of other passengers "little partner" meant he had a close relationship with him, Appellant answered:

A. No Sir, I just—I just use certain words like—I just have certain meanings for a lot of words. I mean, I don't have—I guess the right comprehension skills to just—you know, referring to somebody as the right thing because I was always around just how I say words or just the people I'm around or just—it just—it rolls out of me, yes, sir.

Q. So the—so you understand that this trial is about what—what it looks like some people did that you gave them a ride to. Do you understand that?

A. Can you repeat that, Mr. Cox?

Q. Okay. You understand that—

The Court then excused the jury to conduct a competency evaluation. Dr. Lisa Clayton, who evaluated Appellant, found that Appellant was competent, but had a low IQ. Defense counsel requested to call Dr. Clayton as a witness before the jury, but the court denied the request. As a proffer of proof, however, Dr. Clayton was allowed to testify before the court as to the following:

- Appellant has a below-average IQ in the range of 70–80.

- An IQ of 55–65 is considered intellectual disability.

- Due to Appellant's IQ and history, he would be more likely to seek approval from others.

- Appellant's IQ makes him naïve and unable to think abstractly about motives or consequences.

- When Appellant is under stress he might freeze or be unable to remember things.

The jury never heard Dr. Clayton's conclusions regarding Appellant's diminished IQ and Appellant continued his testimony. He told the jury that he only knew Mondo by his nickname, he didn't see him very often, he couldn't remember what he was thinking about giving him a ride, but he was unaware he was giving Mondo a ride to commit a crime. He testified that he learned a burglary and murder happened about twenty-four hours later and "It made [him] feel like real dumb. It made [him] feel . . . it wasn't right."

When Appellant's testimony on direct examination concluded, the State moved to introduce "character evidence," or evidence of his "level of sophistication" through YouTube rap videos "relat[ing] to his ability to understand what people are communicating to him and form his own opinions about things."

The first video does not depict Appellant but is a picture of three cartoon cough syrup bottles affixed with cartoon faces of the three wise monkeys. The photo also depicts the name of the song "I.W.T." (I Won't Tell) and Appellant's rap name, "Block Da Foo Foo." The second rap video the State sought to introduce depicts Appellant amongst a crowd inside a house. The crowd is dancing and singing, and Appellant appears to be rapping the lyrics which make references to weapons, cough syrup, and being a "trap king."

Appellant objected on grounds of relevance, that the State never proved Appellant wrote the lyrics, how long it took him to come up with the lyrics, or if the voice is Appellant's since Appellant appears to be lip-syncing in the video. He also objected that "this song is a glorification of criminal activity, including guns and drugs and violence. And in a case like this, its prejudicial effect would be quite significant…its prejudicial effect significantly outweighs [its] probative value." In response, the court noted that Appellant "certainly" brought his character into question based on his testimony." The trial court overruled all of Appellant's objections "because the Defendant testified as to him being friendly, [which] opened the door to the character witness evidence . . . in addition to the rest of his testimony." Defense counsel then requested that Dr. Clayton be allowed to testify given that the State was putting on evidence of cognitive ability. The trial court never ruled on that request in the record, and the issue does not appear within the record again.

The State then pursued the following line of questioning to admit the videos:

Q. …Are you a rapper, Mr. Hart?

A. I mean, I do—I do rap, but that's—that's just a hobby I have. It's—it's I write lyrics, that's it.

. . .

Q. Do you currently have two rap videos?

A. Yes, ma'am.

Q. And one of those is called I Won't Tell?

A. Yes, ma'am.

Q. And the other one is called the Dirty Dusty; is that right?

A. No, that's the artist.

The trial court admitted both videos over Appellant's objections, and the State continued its cross-examination:

Q. Mr. Hart, what is the meaning of I Won't Tell? What are you referring to?

A. I mean, this song—I mean, I have no reason—no meaning to that. It's just I—I like to rap. It's—

Q. Okay. Could you possibly be referring to this case, you won't tell?

A. No, ma'am.

Q. Okay. It's just convenient that it matches up?

A. It's—it's just a song, ma'am.

As far as the second rap video, Appellant testified that the other rapper in the video "he totally wrote my version for me." He denied holding cough syrup and stated they were empty bottles the group "wrap[ped] labels on." Moreover, he emphasized he doesn't own any guns. When asked what it means to be a "trap king," Appellant responded, " . . . you probably hear of [Gucci] Mane, Jay-Z. And I know you have heard of these guys because they're [mainstream] artists. They talk about it all the time."[3]

---

[3] Urban dictionary identifies "trap king" as "an exuberant drug dealer that hones a legendary street stature." See Urban Dictionary, available at https://www.urbandictionary.com/define.php?term=trap%20king [last accessed Jan, 10, 2024]. Trap king references are near-ubiquitous in southern "trap" music. *See e.g.* GUCCI MANE, BIG CAT INTRO (2007); 2 CHAINZ, EL CHAPO JR (Def Jam Recordings 2015) ("I'm the king of the trap"); YO GOTTI, TRAP QUEEN FREESTYLE (CMG Records 2015) ("and I'm the trap king"); TOREY LANEZ, BARTENDERS & SPENDERS (2017) ("Trap king getting' to the bands though"); FREDO SANTANA FT. KEVIN GATES, KEEP GETTING' MONEY (RBC Records & Savage Squad Records 2015) ("Trap king, introduce you to my kitchen").

Appellant's denial of owning any guns led the State to introduce additional rap lyrics and photos, this time posted on Facebook, referencing guns.[4] The court again overruled relevancy and prejudice objections from Appellant. Still on cross-examination, Appellant explained that the posts were either lyrics written by other people or slang that he didn't intend to imply possessing weapons.

The defense closed its case by calling Appellant's mother to testify that Appellant spent a significant amount of time in remedial courses, that he was bullied as a child, that he doesn't often understand others' intentions, and that he is eager to please people.

The jury returned a guilty verdict and sentenced Appellant to life without parole.

## APPEAL

On direct appeal, Appellant argued the trial court erred when it introduced the rap videos, Facebook posts, his oral statement to law enforcement, and a witness's credibility opinion. He further argued the trial court erred when it excluded Dr. Clayton's testimony about Appellant's intelligence. A majority of the panel upheld the trial court's ruling on the evidence. *Hart v. State*, No. 05-19-01394-CR, 2022 WL 3754537 (Tex. App.—Dallas Aug. 30, 2022)(mem. op., not designated for publication). As to the rap videos specifically,

---

[4] "You know I draw down. You draw attention, slime." Appellant replied that the verse was a Young Thug lyric. It actually comes from the Lil Wayne and Chocolate Droppa's (Kevin Hart) 2016 BET Hip Hop Awards performance. LIL WAYNE & CHOCOLATE DROPPA, BET HIP HOP AWARDS – CYPHER 6 (2016). Appellant likely confused the lyric with Young Thug's "Draw Down." YOUNG THUG, DRAW DOWN (2015).

"[P]ull up with them straps on me like Steve Urkel," is a commonly-used metaphor, but appears verbatim in "Just Made a Play." YOUNGBOY NEVER BROKE AGAIN, JUST MADE A PLAY (2017).

"The best advice I can give my lil n*****, don't get caught." Again, Appellant was adamant that the verse belongs to another rapper. It does. GUCCI MANE, STRIPPA (Paper Route Empire 2016).

the majority held that the rap videos were relevant to guilt or innocence in that they were a "small nudge toward proving a fact of consequence — specifically, appellant's ability to comprehend, and to form intent regarding [] [Mondo]'s plan to break into Gardner's home." *Id.* at *7 (quoting *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) (internal quotation marks removed)). Because Appellant put his credulity at issue in his testimony and offered evidence to that effect, the appellate court held, it was not error to admit evidence rebutting it. *Id.*

The court of appeals also undertook a balancing test under Rule 403. TEX. R. EVID. 403. The court first noted that the evidence held considerable relevance as it rebutted Appellant's "limited communication and comprehension skills." *Id.* at *8. The court of appeals noted Appellant's argument that introduction of the videos encouraged the jury to "vilify Appellant's character for cultural reasons," but held the trial court could have concluded the State's need for the evidence outweighed such considerations. *Id.* As to the potential for misleading the jury, the court of appeals agreed: "the evidence did have potential to impress the jury in some irrational but nevertheless indelible way." *Id.* at *8 (quoting *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (internal quotation marks omitted)). Nevertheless, it did not find the trial court's ruling constituted a clear abuse of discretion. *Id.*

The dissent agreed that the evidence was admissible under Rule 404(a)(2)(A) as character evidence but should ultimately have been excluded under Rule 403. *Hart*, 2022 WL 3754537 at *16 (Reichek, J., dissenting). Justice Reichek explained:

> Gangsta rap like that at issue in this case is characterized by 'lyric formulas,' a key one of which involved fictionalized bragging about the performer's 'badness' vis-à-vis criminal behavior . . . The genre often emphasizes violence in inner cities albeit not necessarily in an accurate manner.

*Id.* (citing Erin Lutes, et. al., *When Music Takes the Stand: A Content Analysis of How Courts Use and Misuse Rap Lyrics in Criminal Cases*, 46 AM. J. CRIM. L. 77, 84 (2019); Nicholas Stoia, Kyle Adams & Kevin Drakulich, *Rap Lyrics as Evidence: What Can Music Theory Tell Us?*, 8 RACE & JUST. 300, 330–34 (2018). Justice Reichek also noted persistent bias about rap and rap artists meant that introduction of the evidence would have an enormous prejudicial effect and, because the State never proved Appellant authored the lyrics to anything introduced, the rap "shed no light on appellant's ability to communicate with words, because these weren't his words at all." Even assuming Appellant wrote the lyrics to "'I Won't Tell,' there was no evidence of the ease with which he wrote these lyrics, how long it took him to write them, or whether anyone assisted him." *Id.* at *17. Of the lyrics introduced, this song was the least sophisticated and did not establish a connection with any fact of consequence is the case. As a result, Justice Reichek wrote, any perceived probative value was vastly outweighed by the prejudicial effect. *Id.*

Appellant filed a petition for discretionary review echoing the appellate court's dissent and arguing that court erred when it minimized the "harm, bias, and prejudice injected into the trial" by virtue of the rap videos and Facebook pages. We granted review and, for the reasons set forth below, agree with Appellant, reverse the judgment of the court of appeals, and remand to the trial court for proceedings consistent with this opinion.

<u>LAW</u>

***Standard of Review***

We review a trial court's decision whether to admit or exclude evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). This Court will not reverse the ruling of the trial court except where there has been a clear abuse of discretion falling outside the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). Although appellate courts offer wide deference to trial courts, "appellate supervision" is necessary in cases of abused discretion. *Id.* at 392 (quoting 22 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE §§ 5249 & 5250 (1978), at 540, 544). Moreover, "[t]he trial court has no 'right' to be 'wrong' if that means to admit evidence which appears to the appellate court, affording all due deference to the trial court's decision, nevertheless to be substantially more prejudicial than probative." *Id.* at 392–93.

***Rule 403***

Texas Rule of Evidence 403 is one of judicial economy. It excludes otherwise relevant evidence when the costs of admission outweigh its utility. It reads: "The [trial] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. To determine whether evidence is admissible under Rule 403, Texas appellate courts will use the *Montgomery* factors: (1) the strength of the evidence's probative value, (2) the potential for the evidence to "impress the jury in some irrational but nevertheless indelible

way," (3) The amount of time required at trial to develop the evidence, and (4) the proponent's need for the evidence. *Montgomery*, 810 S.W.2d at 389–90.

ANALYSIS

## Appellant's Rap Videos

### *(1) Probative Value*

The initial step in using a 403 balancing test is identifying the probative value of the evidence. *Hall v. State*, No. AP-77,062, 2021 WL 5823345 (Tex. Crim. App. Dec. 8, 2021). Evidence is probative if it tends to make a fact of consequence more or less likely. TEX. R. EVID. 401(a). Moreover, the State has a need for the evidence where it would prove some consequential fact unavailable from other sources. *See Manning v. State*, 114 S.W.3d 922, 927–28 (Tex. Crim. App. 2003). Probative value is the first *Montgomery* factor. 810 S.W.2d at 389–90.

In the instant case, Appellant did not dispute the fact he drove three individuals to the apartment complex where the complainant lived, or that those same individuals committed a burglary of the complainant's apartment, shot him, and left him for dead. Rather, Appellant contested a single fact at trial, one of great consequence to the State's case: Appellant did not understand that he was driving the group to commit a robbery and murder. The parties' opening and closing statements reflect this. The State emphasized:

> The Defendant knew. He had been in an apartment complex not far away from the victim's apartment. He knew that he and a group of people were planning to commit a crime. He knew he agreed to commit that crime. He knew they were going to go and commit burglary. They were going to steal some things. And he agreed to take four people to the victim's apartment complex. He agreed to sit there and wait.

The State relied in part on Appellant's statement to the police for this proposition. In the statement, Appellant tells the officers that when he drove the group to the complainant's apartment, he was told they were "breaking into [Mondo's] uncle's house." The State also pointed out inconsistencies in Appellant's testimony: that he said there were only three people in the car when there were actually four; that he knew folks at his godbrother's apartment complex to carry guns but didn't see any on the night in question; that he was only going to wait in the parking lot for five minutes when he really waited eleven; and, that the other individuals didn't have anything when they can be seen carrying something on surveillance. Through surveillance footage, the State also sought to prove that Appellant drove by the complainant's vehicle in the parking lot to "mak[e] sure the victim's car [was] there." It further introduced evidence that following the murder and his own conversations with police, Appellant made internet searches on his phone for "[D]allas murders 2017" and "if you was driver on a murder." The State also pointed out that Appellant went back to the apartments where Mondo and the other individuals spent time, despite his earlier claim that involvement in the crime "scared [him] to death."[5] Finally, the State asked Detective Trujillano:

> Q. And if somebody knew that his friends had guns and chose to go along to commit a felony at this time of night on that particular day, looked for the car to make sure he's there, would you say that that person should have anticipated that a capital murder would result?
>
> Detective Trujillano: Yes.

---

[5] During his testimony, Appellant said that what he meant by being scared was: "It just was like a car was so close to me – well, it was close with cars flying that same day. Yes, sir."

After the State rested, Appellant put on his case-in-chief consisting primarily of his own testimony alleging he is a nice person who does favors for others such as giving them rides and that he did not understand the implications behind the statements and actions of the individuals in his car. In response, the State moved to introduce the complained-of rap lyrics, alleging they were relevant as "character evidence," rebutting Appellant's testimony that he is a "friendly person," that he is not sophisticated, and that he is "not good with literature." According to the State, the proffered evidence, in addition to proving Appellant was a "bad person," "relate[s] to his ability to understand what people are communicating to him and form his own opinions about things."

In response, Appellant objected primarily that the videos were not actually relevant to sophistication and comprehension because there was no evidence Appellant wrote the lyrics, was singing them as opposed to lip-syncing, or, if he did, "how long it took him to write them." The State offered no proof Appellant wrote the lyrics introduced, and Appellant contested that in his testimony, alleging most of the lyrics were written for him or were lyrics borrowed from other rap artists.

As outlined above, a certain piece of evidence is probative if it "tend[s] to make a fact more or less probable…" TEX. R. EVID. 401(a). Here, the song Appellant did not dispute he wrote, "I.W.T," was probative of his comprehension skills. As Justice Reichek noted in her dissent, the lyrics to the song are not "profound," but nevertheless "'provide[] a small nudge toward . . . disproving some fact of consequence,' in this case, his ability to comprehend what people tell him." *Hart v. State*, No. 05-19-01394-CR, 2022 WL 3754537

at *15 (Tex. App.—Dallas Aug. 30, 2022, pet. granted) (Reichek, J., dissenting) (quoting *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004)).

As to the second song, "Off Days," although Appellant disputed having written the lyrics, and the State produced no evidence he had, the song and video was probative in so far as Appellant claimed he had no prior knowledge about criminal activity in Dallas being different than it was where he was from in Greenville.

The court below concluded that "evidence of appellant's ability to rap, lip sync, or post lyrics about crime is a 'small nudge' toward proving a 'fact of consequence'— specifically, appellant's ability to comprehend, and to form intent regarding, little partner's plan to break into Gardner's home." *Hart*, 2022 WL 3754537 at *17. Assuming this is correct, we must consider whether the value of this probative evidence is outweighed by its potential for unfair prejudice. For this, we continue to the second *Montgomery* factor.

### *(2) Time Needed to Develop the Evidence*

As a secondary inquiry, we ask how much trial time was dedicated to the development of the evidence such that its introduction caused undue delay. *Montgomery*, 810 S.W.2d at 389–90. This factor focuses on the time needed "to develop the evidence, during which the jury [is] distracted from consideration of the indicted offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005); *see Montgomery*, 810 S.W.2d at 390. Because the concern is the extent to which the jury is distracted from considering the charged offense, we hold that the time needed to develop the character evidence necessarily includes any testimony introduced regarding the evidence, including cross-examination, redirect examination, and any rebuttal offered by the defense in response to the evidence.

Accordingly, the State developed the rap videos when Appellant took the stand in his own defense. The time needed to develop the rap lyric video evidence amounted to about six pages out of the fifteen pages of the record of Appellant's cross-examination of by the State. During the cross-examination, the State played the videos. The time of each video was 4 minutes and 13 seconds and 3 minutes and 17 seconds; however, the State would periodically pause the video to discuss certain video images or specific lyrics. The entire re-direct examination was devoted to the rap video evidence. Appellant's testimony consisted of 45 pages of the record. Eight (8) pages of the record were exclusively focused on the rap videos. Five (5) were exclusively focused on Appellant's photos and rap lyrics from his Facebook postings. Therefore, approximately twenty-eight percent of Appellant's testimony was spent on the extraneous evidence. Evidence that consumes such an inordinate amount of time has the potential to confuse or distract the jury from the main issues. *See Gigliobianco*, 210 S.W.3d at 641. Therefore, this factor weighs in favor of exclusion.

### (3) Prejudicial Dangers

Turning to the third *Montgomery* factor, we address "the potential the 'other crimes, wrongs, or acts' have to impress the jury in some irrational but nevertheless indelible way." *Montgomery*, 810 S.W.2d at 390. This "unfair prejudice" question asks whether the evidence has a "tendency to suggest decision on an improper basis," usually emotional in nature. *Valadez v. State*, 663 S.W.3d 133, 142 (Tex. Crim. App. 2022).

While Texas has not yet addressed this issue, courts in other jurisdictions have recognized that the admission of rap music or rap videos is highly prejudicial due to the

nature of the lyrics that distract from the charged offense. *See e.g. Baker v. State*, 2024 Ga. LEXIS 64, 2024 WL 923100 (holding the trial court abused its discretion by admitting a portion of a rap music video into evidence at defendant's trial for malice murder because it created a substantial danger of unfair prejudice by improperly portraying defendant as having a propensity for violence); *United States v. Gamory*, 635 F3d 480, 493 (11th Cir. 2011) (explaining that the admission of a rap video containing explicit lyrics dealing with drugs, sex, profanity, degradation of women, firearms, and violence was error and "heavily prejudicial" ); *State v. Skinner*, 218 N.J. 496, 521 (95 A3d 236) (2014) ("Finally, the prejudicial effect of defendant's graphically violent rap lyrics overwhelms any probative value that they may have"); and, *Commonwealth v. Gray*, 463 Mass. 731, 756 (978 NE2d 543) (2012) (explaining that the rap video had a prejudicial impact on the jury).

In *United States v. Bey*, the Eastern District of Pennsylvania noted that lyrics in rap songs often contain inflammatory material that is entirely irrelevant to the case at hand which risks inflaming the jurors and have no bearing whatsoever as to whether the defendant committed the offense charged. No. CR 16-290, 2017 WL 1547006 at *6 (E.D. Pa. Apr. 28, 2017)("Rap lyrics are not necessarily autobiographical statements; rather, rap music is a well-recognized musical genre that often utilizes exaggeration, metaphor, and braggadocio for the purpose of artistic expression.").

But by no means is rap the exclusive genre for glorification of criminal activity. Most song lyrics are often fictitious or exaggerations of real events. Other than Taylor Swift who is known to write songs based on her personal experiences, it is not reasonable to assume that all lyrics are autobiographical as to past or future conduct, unless there is

direct evidence to suggest otherwise. Holding song lyrics to their literal meaning would lead to the following conclusions: Freddie Mercury "killed a man,"[6] Bob Marley "shot the sheriff,"[7] Macy Gray "committed murder and . . . got away,"[8] the band formerly known as The Dixie Chicks killed Earl,[9] and classically, Johnny Cash "shot a man just to watch him die."[10] These are conclusions we cannot accept outside of some other evidence demonstrating the lyrics are something more than fiction. *See Smith v. Deville*, 2020 U.S. Dist. LEXIS 130699 (E.D. La., Apr. 16, 2020)(admitting two rap videos but not another where the admissible videos specifically described the subject of the charge and the inadmissible video did not); *United States v. Belfast*, 611 F.3d 783, 793, 820 (11th Cir. 2010) (finding no abuse of discretion when defendant performed the song and described violence and killing that was pertinent to defendant's charges under the Torture Act); *Gamory*, 635 F.3d at 485-93 (finding abuse of discretion in admitting videos performed by a non-defendant that corroborated the defendant's general lifestyle but were cumulative of other testimony and highly prejudicial due to the violence, profanity, and general lawlessness); *United States v. Stuckey*, 253 F. App'x 468, 473-82 (6th Cir. 2007) (unpublished) (finding no abuse of discretion in admission of rap lyrics that described killing snitches and Government witnesses "wrapping them in blankets" and

---

[6] QUEEN, "*Bohemian Rhapsody*" on A NIGHT AT THE OPERA (1975).
[7] BOB MARLEY AND THE WAILERS, "I *Shot the Sheriff*" on BURNIN' (1973).
[8] MACY GRAY, "*I've Committed Murder*" on HOW LIFE IS (1999).
[9] DIXIE CHICKS, "*Goodbye Earl*" on FLY (1999).
[10] JOHNNY CASH, "*Folsom Prison Blues*" on JOHNNY CASH WITH HIS HOT AND BLUE GUITAR! (1957).

"dumping their bodies in the street," which was exactly what the Government accused the defendant of doing).

The videos introduced by the State were a glorification of criminal activity. The lyrics and videos included references to illicit drugs, criminal activity in general ("dirty money"), snitching, owning weapons, degrading women, and, classically, being a "trap king." As discussed above, other courts have recognized that the content of these songs and videos can unduly prejudice the jury because music can impact a jury in an emotional way.[11] As in many of those cases, there is no question here that the introduction of Appellant's rap videos encouraged the jury to convict him on the improper basis that he is a criminal generally or associates with criminals generally. This is because any song that glorifies criminality, regardless of genre, is inherently prejudicial. The danger associated with playing these videos to the jury is that the jury might regard creative expression as proof that Appellant engaged in criminal behavior based upon his rap videos instead of regarding them as nothing more than creative expression. This is problematic in Appellant's case for two reasons. First, Appellant lacked the inherent familiarity of a popular artist that provides the ability to disassociate the artist with the individual. Unlike an easily recognizable pop star, the listener cannot disassociate "Block Da Foo Foo" from the message. Second, the subject matter in the expression is itself inflammatory. Regardless of the genre, inflammatory lyrics create the potential that the

---

[11] *See* Jason B. Binimow, *Admissibility of Rap Lyrics or Videos in Criminal Prosecutions*, 43 A.L.R. 7th Art. 1 (2019) (inventorying American caselaw excluding or admitting rap lyrics and videos on the basis of their prejudice relative to their probative value).

jury could ascribe character assessments to the defendant based on the content of the music he listened to or lyrics he wrote. Said plainly, music lyrics do not prove anything about the character of the person who listens to the music or lip syncs to it on video.

"[W]e don't convict people for murder simply because they have written lyrics about murder." *Stuckey*, 253 F. Appx. at 483. To the Sixth Circuit's point, we certainly wouldn't convict a person of murder for rapping about drinking, drugs, and guns. Here, the State did not offer anything demonstrating that the lyrics and video were somehow representative of Appellant's character in that they applied outside of the artistic rendering, nor did they demonstrate that, even if they had some real-world application, it was relevant to the charged offense. This factor therefore weighs heavily in favor of exclusion.

### (4) State's Need

The State's need for this evidence was weak. As discussed above, the State had several other available options to address Appellant's mental state when he drove the individuals to the complainant's apartment. These methods included Appellant's statement that Mondo told him they were going to "break in" to his uncle's house, inconsistencies or "evasiveness" in the same statement, surveillance footage of Appellant pulling the car around the parking lot prior to letting the other individuals out of the car, Appellant's internet-search activity in the days following the murder, and the fact Appellant subsequently visited the apartments again despite being purportedly "scared to death" at the time of the shooting. This evidence tended to show Appellant was aware of the circumstances surrounding the trip to the complainant's apartment. As a result, we find this factor weighs in favor of exclusion.

### *Weighing the Factors*

Considering the extreme danger of prejudice resulting from introduction of Appellant's rap videos, admission of the videos was error under Rule 403. The videos' probative value was incredibly weak, especially where the State introduced no evidence that Appellant authored the lyrics, or merely memorized them. Was he actually singing or was he lip syncing? Did he have any assistance in becoming proficient enough to perform, and how long did it take for him to be able to "successfully" pull off the performance?

Without answers to these questions, using the video introduced in this trial was unfairly prejudicial, and proved very little about his intellectual capabilities. The videos did not reflect any significant amount of credulity or articulacy, and were not relevant to Appellant's character, since there was no evidence outside of the lyrics themselves corroborating that Appellant was a violent or unfriendly person. In fact, the State conceded at oral argument that the mere act of lip syncing a song (regardless of the genre) does not make one a friendly or unfriendly person. Instead, the State seemed to focus more on the usage of the videos for the purpose of refuting Appellant's claim that he was slow and not good with language and was oblivious to any sort of criminal activity occurring around him. However, the State had other evidence to demonstrate Appellant's knowledge of criminal activity and potential association with that activity other than the videos and had the opportunity to cross-examine Appellant's mother, who presumably would have much more pertinent, relevant insight into Appellant's ability to understand language than rehearsed, choreographed, and inflammatory music videos would. Introduction of the videos was therefore unnecessary to a fair adjudication of the issues.

***Harm***

Having found error, we proceed to a harm analysis. TEX. R. APP. P. 44.1(a). Because the error in this case was an abuse of discretion in admitting certain evidence, we review the record for error affecting Appellant's "substantial rights." TEX. R. APP. P. 44.2(b). In doing so, we review the entirety of the record to understand the evidence in the context of the trial. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). If the error had more than a slight influence on the verdict, Appellant is entitled to a new trial. TEX. R. APP. P. 44.2(b).

Because Appellant did not contest whether he drove four individuals to an apartment complex whereupon they committed capital murder, the only issue at trial was *mens rea*, whether Appellant knew what he was doing and should have foreseen the result. The State focused its case on proving this mental state. In doing so, it asked law enforcement officers to give several negative credibility determinations of Appellant, which were admitted with no objection.[12]

---

[12] The State: Okay. During the course of that interview, did he tell you how many people he took to the victim's apartment complex?
Detective Trujillano: Eventually he said it was three people.
The State: Okay. And was that a lie?
Detective Trujillano: Yes.
…
The State: Okay. Did he say how long he was going to wait for the people once he dropped them off?
Detective Trujillano: He said he was only going to wait five minutes.
The State: Was that a lie?
Detective Trujillano: Yes.
…
The State: Did he say they had anything with them?
Detective Trujillano: No.
The State: Was that a lie?

Following the State's case, Appellant's case primarily consisted of his own testimony. He testified that he had a hard time remembering, he is a friendly person and believed he was just giving a ride, he doesn't think critically about the words he uses, he has a hard time understanding things, and when he discovered what happened, he felt dumb.

In providing additional context for Appellant's concededly "dumb" actions, Appellant sought to introduce testimony from his competency hearing that revealed he has a low IQ and potentially could not understand the underlying motives of the individuals in his car on June 21. The trial court did not permit this evidence, however. Had Dr. Clayton been allowed to testify, she would have told the jury that individuals with diminished IQ trust others easily, are more naïve, don't think abstractly about the motives of others, are more forgetful when under stress, and are generally more susceptible to manipulation by others. The jury, in this sense, was not allowed to hear Appellant's side of the story despite it having heard the State's full story assisted by officers' credibility determinations.

Then came the rap videos. After having heard the State cast Appellant as a liar, as testified to by law enforcement, and being deprived of potentially helpful testimony from Dr. Clayton, the State introduced both rap videos to demonstrate Appellant was literate and

---

Detective Trujillano: Yes.
…
The State:—is that right? Did you ask him about the victim's vehicle?
Detective Trujillano: I did.
The State: And what—did he say he knew anything about that?
Detective Trujillano: He claimed he didn't know what that was or what car it was.
The State: And was that a lie?
Detective Trujillano: Yes.

articulate. As discussed above in the context of Rule 403, these rap videos did very little to prove that fact and instead cast Appellant and his fellow performers as criminals in general, untethered to the particular facts of the charged offense. Moreover, while introducing the videos, the State went as far as injecting its own interpretations of slang words into Appellant's testimony.[13]

Following Appellant's testimony, Appellant called his mother to testify to the fact that Appellant was in special education classes, had a hard time remembering, and required additional care and instruction as a child. After her testimony, Appellant rested.

The State emphasized both Appellant's *mens rea* and the "type of criminal" it proposed Appellant was in its closing argument:

> [T]his is not Mayberry RFD and this guy is no Gomer Pyle . . . Larry Hart is criminally responsible for Michael Gardner's murder because he knew—he should have anticipated what was going to happen . . . Larry Hart is the kind of criminal that sneaks around at night, breaks into people's apartments, with a gun to their head and leaves them for the coroner to pick up.

While the State argued here that Appellant acted as more than a driver, much of the evidence developed at trial was that Appellant served as the driver and did not enter the residence. Had the evidence more directly implicated Appellant as an active participant instead of a party, this might have been a closer case. However, we decline Appellant's

---

[13]    The State: And in the I Won't Tell video, you talk about killing somebody over a bill, *so killing somebody over cash*; is that right?
Appellant: I didn't say I killed anyone, ma'am.
    . . .
The State: And you say you keep a heater. *A heater is a gun, isn't it*?
Appellant: I didn't say I keep a heater on that song.

request to draw a bright-line rule that all artistic expression should always be excluded from a criminal proceeding unless it is a truthful narrative of the offense.

Lastly, the jury was not given a limiting instruction to restrict their use of the rap videos to their stated purpose. "[W]here no limiting instruction is given . . . we must conclude that any prejudice resulting from introduction of the extraneous offense is unabated." *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994). Viewed in light of the record as a whole, we find introduction of extraneous rap videos had more than a slight effect on the jury's verdict and therefore affected Appellant's substantial rights.

**Appellant's Facebook Posts**

Because we found reversible error with respect to rap videos introduced by the State, we need not address the admissibility and harm of the complained-of Facebook posts.

CONCLUSION

We think Appellant stated our view on the issue at hand best when he said, "it's just rap, m'am." Because the rap videos highly prejudicial in nature in the context of a guilt-innocence proceeding, Appellant has shown reversible error. We reverse and remand to the trial court for a new trial.


FILED: May 8, 2024

PUBLISH